**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE RAMACO RESOURCES, INC. SECURITIES LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Case No. 1:26-cv-00846-ER<br><br>CLASS ACTION<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS


I. I.NATURE OF THE ACTION ..... 1

II. JURISDICTION AND VENUE ..... 5

III. PARTIES ..... 6

A. Plaintiffs ..... 6

B. Defendants ..... 6

IV. SUBSTANTIVE ALLEGATIONS ..... 8

A. Background of Ramaco ..... 8

B. Ramaco Acquires the Brook Mine in Sheridan, Wyoming ..... 8

C. The Significance of Rare Earth Elements ..... 9

D. Ramaco Pivots to REEs and Other Critical Minerals ..... 12

E. Shortly Before the Class Period, Defendants Highlight Developments at the Brook Mine ..... 15

F. Defendants Make a Series of Materially False and Misleading Statements During the Class Period, Artificially Inflating Ramaco's Stock Prices ..... 18

i. July 1, 2025 Statements ..... 18

ii. The July 8, 2025 Press Release ..... 24

iii. The July 10, 2025 Press Release and PEA Summary ..... 25

iv. After Defendants' Misstatements, Ramaco Holds a "Groundbreaking" Ceremony at the Brook Mine and its Stock Price Rises ..... 28

v. July 23–24, 2025 Senior Notes Offering ..... 30

vi. July 29, 2025 Press Release ..... 31

vii. July 31, 2025 Press Release ..... 32

viii. August 1, 2025: 2Q25 10-Q ..... 33

ix. August 1, 2025 Earnings Call ..... 37

x. August 5–7, 2025 Equity Offering ..... 41

xi. August 5, 2025 Analyst Reaction ..... 42

xii. September 4, 2025 Press Release ..... 43

xiii. September 18, 2025 Statements ........ 44

xiv. The September 2025 TRS Failed to Comply with SEC Regulation S-K 1300........ 46

G. The Truth Is Reveled Through a Series of Disclosures, Though Defendants Continue to Mislead Investors ........ 49

i. October 23, 2025: the Wolfpack Report ........ 49

ii. October 27 and 28, 2025: Defendant Confirm that Wolfpack Was Correct In Certain Respects, Yet They Continue to Mislead Investors .... 52

iii. Expert Interviews During October and November 2025 ........ 56

iv. February 25 and 26, 2026 ........ 60

H. Post-Class Period Events ........ 64

V. CLASS ACTION ALLEGATIONS ........ 64

VI. LOSS CAUSATION ........ 66

VII. ADDITIONAL SCIENTER ALLEGATIONS ........ 67

A. Defendants' Detailed Statements about The Brook Mine and Their Admissions of Direct Involvement in the Project Contribute to Scienter ........ 67

B. Woloschuk Was Directly Involved in the PEA while at Fluor ........ 68

C. Defendants Raised Hundreds of Millions of Dollars from Investors While the Company's Stock Prices were Artificially Inflated ........ 68

D. Insider Sales ........ 69

E. Defendants' Prior Misconduct ........ 70

F. The SEC Sent Defendants a Comment Letter Regarding Their Statements Concerning the Brook Mine ........ 71

VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ........ 72

IX. NO SAFE HARBOR ........ 73

X. COUNTS ........ 74

XI. PRAYER FOR RELIEF ........ 77

XII. JURY TRIAL DEMANDED ........ 78

Co-Lead Plaintiffs Andrew Clark, Phil McBridge, and Edward Van Vliet (together, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' (defined below) public documents; conference calls and announcements made by Defendants; United States ("U.S.") Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding Ramaco Resources Inc. ("Ramaco" or the "Company"); investment analysts' reports about the Company; and information readily obtainable on the Internet. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

## I. NATURE OF THE ACTION

1. This is a class action asserting securities fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, 17 CFR 240.10b-5, on behalf of a class of all persons and entities that purchased or otherwise acquired shares of the Class A common stock and/or Class B common stock of Ramaco, or call options, or sellers of put options, between July 1, 2025 and February 26, 2026, both dates inclusive (the "Class Period"), and were damaged thereby, with customary exclusions.

2. These claims are brought against Defendants: (i) Ramaco; (ii) Randall W. Atkins, a founder of Ramaco, the Chairman of its Board of Directors ("Board") since August 2015, and its Chief Executive Officer ("CEO") since January 2021; (iii) Jeremy R. Sussman ("Sussman"), Ramaco's Chief Financial Officer ("CFO") since May 2019; (iv) Michael Woloschuk

[1] Emphases herein are added unless otherwise noted.

("Woloschuk"), Ramaco's Executive Vice President ("EVP") for Critical Minerals Operation since May 12, 2025; and (v) Christopher L. Blanchard ("Blanchard"), Ramaco's EVP for Mine Planning and Development since May 2024 and Chief Operating Officer ("COO") from December 2017 to May 2024.

3. Ramaco is a deteriorating metallurgical coal company. Indeed, coal as an industry is largely on the decline in the United States. However, in 2022, Ramaco acquired the Brook Mine, in Sheridan, Wyoming, from an affiliate. Ramaco told investors that the mine had "promising levels of high concentration of" rare earth elements, which are vital for many modern industries and have emerged as a geopolitical issue given that production of rare earth elements (or "REEs") is dominated by the People's Republic of China.

4. Defendants recognized the opportunity this presented. Bipartisan support for developing a domestic US supply chain for REEs and other critical minerals ("CMs") led to the second Donald Trump presidential administration declaring critical mineral independence from China a national security emergency, leading to billions in federal funding flowing through the Department of Energy ("DOE") and Department of Defense ("DOD"). The capital markets were hungry for any credible domestic supply chain story.

5. Ramaco thus made an aggressive pivot from coal to REEs, touting the Brook Mine as its bridge to future profits. Ramaco claimed the Brook Mine's coal seams and surrounding carbonaceous clays and shales contained an exceptional concentration of REEs and CMs, including scandium, a CM that is often grouped with REEs, and sometimes referred to as an REE. As Ramaco's plan to commercialize the mine proceeded, Defendants made ever more grandiose claims.

6. On July 1, 2025, the first day of the Class Period, Defendants touted a Preliminary Economic Assessment ("PEA") they had commissioned from Fluor Corporation (the "Fluor PEA"), which Defendants claimed established that their strategy to mine REEs and CMs at the Brook Mine was economically feasible. This representation, however, was based on a narrative that fully exploited the information asymmetry that existed in the opaque market for scandium. collectively raised a little over $100 million. With no reliable Western price index, no liquid spot market, and transaction data buried in private contracts, the obscure nature of the scandium market enabled Defendants to mislead investors.

7. The scandium pricing and market assumptions were the linchpin of the entire scheme: every headline metric Defendants touted to investors—$1.2 billion net present value ("NPV"), 38% internal rate of return ("IRR"), $143 million projected EBITDA, and the projected revenues and cash flows—was derived from Defendants' assumptions around the price of scandium. Defendants claimed, based on undisclosed "industry sources," that they could sell 65 tonnes of scandium annually at a price of $3,750,000 per metric tonne. Without these assumptions, the strategy analyzed by the Fluor PEA and a later Technical Report Summary ("TRS") commissioned from Weir, International (which violated SEC regulations), would not be economically feasible. Defendants' unsupported assumptions made the critical difference. Defendants made additional misrepresentations concerning pricing and demand for gallium, another CM.

8. Defendants also made repeated false and misleading statements about construction of a pilot plant at the Brook Mine to process REEs and CMs from the ore at the mine, claiming that construction was underway and that the plant would open shortly.

9. These misrepresentations drove the price of the Company's Class A common stock from around $13 per share to over $54 per share before the fraud collapsed. Further, Defendants leveraged their false narrative to secure hundreds of millions of dollars in capital for Ramaco. Ramaco raised more than $600 million during the Class Period by offering senior notes and new stock. This contrasted sharply with Ramaco's prior financing history. Between the Company's 2017 IPO and the Class Period, Ramaco raised only a little over $100 million.

10. On October 23, 2025, Wolfpack Research published a devastating report based on fifteen independent leading experts, site drone surveillance, and market analysis establishing that Ramaco's revenue projections were fiction, the mine was dormant with no mining activity occurring, and the forecasted expectation around demand and pricing for scandium and gallium were deliberately overstated by Ramaco's executives. The experts called Ramaco a "modern day fraud" and a "pump-and-dump scheme," and called Weir International's ("Weir") Technical Report Summary dated September 18, 2025 (the "September 2025 TRS") the "most incompetent pieces of paper assembled together with a staple I've ever read."

11. On this news, Ramaco's stock price fell $3.81, or 9.6%, to close at $36.01 per share on October 23, 2025, on unusually heavy trading volume, and continued to fall during the following days.

12. Defendants continued to mislead investors. Indeed, Defendant Atkins doubled down regarding scandium, stating that based on "discussions with potential scandium oxide offtakers," the Company would see "*almost price insensitive demand*" in excess of the Company's production levels. However, additional disclosures further revealed Defendants' fraud. At the end of the Class Period, on February 25 and 26, 2026, Defendants revealed that they were abandoning their scandium-centric approach, pivoting to an entirely new plan for processing ore at the Brook

Mine, necessitating a new PEA, a redesign of the pilot plant, and delaying the project by well over a year. To date, investors are still waiting on the new PEA, and the Company just recently disclosed that it was just now constructing the "shell" of the pilot plant.

13. At the end of the Class Period, the Class A common stock price fell to $14.93 per share, similar to its price before Defendants' fraud began, injuring the proposed Class of investors. This action seeks to recover those investor damages.

## II. JURISDICTION AND VENUE

14. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

17. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Plaintiffs

18. Plaintiffs, as set forth in their previously-filed certifications (ECF Nos. 14-3 and 27-2), incorporated by reference herein, purchased Ramaco securities during the Class Period, and suffered damages as a result of Defendants' misstatements alleged herein.

### B. Defendants

19. Defendant Ramaco is incorporated under the laws of Delaware with its principal executive offices located in Lexington, Kentucky. Ramaco's Class A and Class B common stock trade on the NASDAQ stock market under the symbols "METC" and "METCB", respectively.

20. Defendant Randall W. Atkins ("Atkins") is a founder of Ramaco and has served as the Chairman of its Board since August 2015 and as its CEO since January 2021. Defendant Atkins also served as Ramaco's CFO from July 2018 to May 2019. Prior to the incorporation of Ramaco, Defendant Atkins served as the Chairman and CEO of Ramaco, LLC, one of Ramaco's predecessors, beginning in 2011.

21. Defendant Jeremy R. Sussman ("Sussman") has served as the CFO since May 2019. Defendant Sussman signed Ramaco's August 1, 2025 10-Q, certifying the accuracy of Ramaco's disclosures and personally reviewed and endorsed a financial model he knew was built on Ramaco-supplied pricing assumptions and bench-scale test data requiring future validation.

22. Defendant Michael Woloschuk ("Woloschuk") has served as the Company's EVP for Critical Minerals Operation since he joined the Company in May 2025 and has responsibilities regarding all aspects of the Company's Brook Mine REE project. Defendant Woloschuk joined Ramaco from Fluor, where he served as the Global Head of Critical Minerals and was directly involved in Fluor's work preparing a PEA concerning Ramaco's Brook Mine REE project.

23. Defendant Christopher L. Blanchard ("Blanchard") has served as the Company's EVP for Mine Planning and Development since May 2024, prior to which he served as the Company's Chief Operating Officer ("COO") beginning in December 2017. Defendant Blanchard was responsible for development of rare earth deposits at Brook Mine and related processing and refining infrastructure to support Company's critical mineral production. Before joining Ramaco, Defendant Blanchard was President of Performance Coal Company, the Massey Energy subsidiary that operated the Upper Big Branch Mine in West Virginia. On April 5, 2010, during Blanchard's tenure as President, an explosion at the Upper Big Branch Mine killed 29 miners—the deadliest U.S. coal mining disaster in four decades. After securing immunity for himself, Blanchard testified in the federal criminal proceedings that ensued regarding safety practices at the mine during his tenure.

24. Defendants Atkins, Sussman, Woloschuk, and Blanchard (together, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background of Ramaco

25. Ramaco was co-founded in 2015 by Defendant Atkins, and incorporated in October 2016, as a developer of metallurgical ("met") coal in central and southern West Virginia, southwestern Virginia, and southwestern Pennsylvania. Metallurgical coal is used to make metallurgical coke ("coking coal"), a key input in the blast furnace steelmaking process, as well as coal for pulverized coal injection ("PCI coal"), which is injected into blast furnaces as a supplemental source of energy. The Company began commercial production of met coal in December 2016.

26. On February 8, 2017, Ramaco completed the initial public offering of its common stock, selling 6 million shares at an offering price of $13.50 per share.

### B. Ramaco Acquires the Brook Mine in Sheridan, Wyoming

27. On February 24, 2022, Ramaco announced that it had entered into an agreement in principle to acquire Ramaco Coal, LLC ("Ramaco Coal"), an entity owned by an investment fund managed by Yorktown Partners, LLC and certain members of Ramaco's management, including Defendant Atkins. Prior to this, much of the coal reserves and surface rights that Ramaco controlled were acquired through a series of mineral leases and surface rights agreements with Ramaco Coal.

28. Ramaco's acquisition of Ramaco Coal closed in April 2022.

29. Ramaco Coal's assets—acquired by Ramaco—included the Brook Mine, an approximately 16,000-acre property in northeastern Wyoming, near Sheridan. At the time, Ramaco Coal was engaged in a multi-year mineral analysis and core drilling assessment of potential concentrations of rare earth elements ("REE" or "REEs") at the Brook Mine. When Ramaco

acquired Ramaco Coal, it told investors that, "[w]hile assessment of the reserves is still in the early stages, initial analysis indicates promising levels of high concentrations of REE."

30. The following month, on May 11, 2022, the Company's Board authorized management to pursue issuance of a "tracking stock" designed to pay dividends based on the financial performance of assets related to the Brook Mine, including metallurgical coal royalty interests, intellectual property and licensing arrangements related to advanced carbon products and materials and the reserve interest and permit rights related to the mine. The Company referred to these assets as the "CORE Assets," with "CORE" referring to "Carbon Ore-Rare Earth."

31. Stockholder approval for issuance of this tracking stock was obtained at a special meeting of stockholders on June 12, 2023. Ramaco then amended and restated its certificate of incorporation to reclassify its existing common stock as Class A common stock, and issued shares of the tracking stock – classified as Class B common stock – to holders of record as of the close of business on May 12, 2023, at a ratio of 0.2 shares of Class B common stock for every one share of existing common held as of May 12, 2023.

## C. The Significance of Rare Earth Elements

32. Rare earth elements—a subset of critical minerals—are a group of seventeen metallic elements that share similar chemical properties and tend to occur together in the same mineral formations. They include the fifteen elements with atomic numbers 57 through 71, which are called lanthanides, as well as scandium (atomic number 21) and yttrium (atomic number 39). Despite their name, rare earths are not geologically scarce in the earth's crust. In fact, they are relatively plentiful. They are called "rare" because they are only found only in compounds, rather than as pure metals, and are difficult to isolate and purify.

33. Geologists have long known that coal basins, particularly in Appalachia and the Powder River Basin of Wyoming, contain rare earth elements and other critical minerals embedded in the coal seams, surrounding clays, and shales. Rare earth elements, which are often found in close proximity to coal deposits, are essential inputs for the permanent magnets that power electric vehicle motors, wind turbines, defense guidance systems, and consumer electronics. Nearly every advanced weapons platform in the U.S. military arsenal depends on rare earth permanent magnets and other rare earth-enabled components, giving rare earths strategic importance in modern defense systems.

34. Scandium is a silvery-white metallic element; it was discovered in 1879 by spectral analysis of minerals from Scandinavia (hence the name). Its chemical symbol is "Sc". Scandium's commercial significance rests almost entirely on one application—its extraordinary effect on aluminum alloys. Additions of as little as 0.1-0.3% scandium dramatically refine grain structure, increase strength, improve weldability, and enhance fatigue and corrosion resistance. This makes scandium-aluminum alloys uniquely attractive for aerospace, defense, and high-performance applications where weight, strength, and weld integrity are simultaneously critical. Despite its unique qualities, the U.S. and global markets for scandium remain insignificant. This is due to the unreliability of supply and the costs associated with its integration into products at scale.

35. The global scandium oxide market consumes roughly 35 metric tons per year in total, a quantity that could be loaded onto a single vehicle. At $700-1,100 per kilogram, which is the range at which actual transactions have been recorded in or around the Class Period, the total market is worth somewhere between $25-40 million annually. Scandium is a specialty product with a handful of buyers and sellers. The market is small and transactions are infrequent. Independently published price indices for scandium oxide do not exist. Unlike other commodities

(copper, gold, etc.), scandium pricing is negotiated privately between counterparties and rarely disclosed, and is therefore particularly opaque. These structural realities made the scandium price and demand assumptions the single most important variables in any economic model of a would-be scandium producer. As further discussed herein, Defendants' assumption that Ramaco could sell 65—or even 180—tons of scandium per year, at more than triple observed transaction prices, was not merely aggressive; it was irreconcilable with the market's observable size, structure, and pricing, and every downstream economic conclusion built on those assumptions—projected revenue, EBITDA, cash flow, NPV, and IRR—was fiction in equal measure.

36. NdPr (neodymium-praseodymium oxide) is a processed rare earth product that serves as the primary input for permanent magnets. Magnets made from NdPr are irreplaceable in any application requiring strong, lightweight, compact magnetic force. There is currently no viable substitute material that replicates the performance of NdPr magnets at scale. The end markets for NdPr are broad, and include electric vehicles, wind turbines, defense systems, and consumer electronics. MP Materials Corp. ("MP Materials") operates the Mountain Pass mine in California, which is considered the only operating large-scale rare earth mine in the United States and the only facility in the Western Hemisphere capable of producing separated rare earth oxides at commercial volumes. It is the sole publicly traded U.S. company to have entered into a formal government offtake agreement for rare earth products, signing a landmark deal with the Department of Defense in 2023 under which the government agreed to purchase NdPr oxide at a guaranteed price floor.

37. In the United States, the extraction and processing of rare earths present significant technical challenges that fail to resolve at meaningful scale. In China, however, economically viable deposits can be processed at competitive costs, allowing China to control roughly 60% of global mining and an estimated 85-90% of separation and processing capacity. The U.S.

government has identified critical minerals as an urgent national security priority, treating China's dominance of rare earth and critical mineral supply chains as a strategic vulnerability. To address the country's dependency on China's supply of, and processing capacity for, rare earth elements and critical minerals, the Federal government has dedicated significant funding to various programs, agencies, and efforts to develop a domestic supply chain.

**D. Ramaco Pivots to REEs and Other Critical Minerals**

38. Ramaco is a relatively small operator with respect to coal. Its peak production, in 2025, was roughly 4-5 million tons, well below the scale of major mining companies, which produce in the range of 15-20 million tons annually.

39. However, Defendants touted the Brook Mine as a transformative asset, positioning the Company to become a global leader as a producer of REEs and CMs. In connection with seeking stockholder approval to issue the Class B common stock, Ramaco told investors that "[b]ased on early sampling and analysis, the results of the NETL's initial analysis of the Brook Mine property and external analysis from Weir International, Inc. have shown REE concentrations characterized by the NETL as "very promising.'"[2] Ramaco characterized this as a "potentially world-class REE accumulation of middle REEs and heavy REEs," and published the following graph purporting to "compare[] the relative concentration of REEs within the Brook Mine property (shown in blue) to known REE mines/deposits around the world":

[2] "NETL" refers to the National Energy Technology Laboratory, a U.S. national laboratory under the Department of Energy Office of Fossil Energy. NETL focuses on research for the production of domestic energy resources.




40. According to Ramaco, the NETL's initial analysis indicated that "the Brook Mine would rank as among the highest concentrations of REEs found in any deposits on a world-wide basis, including Chinese deposits."

41. On May 3, 2023, Defendant Atkins wrote a letter to shareholders stating that the Brook Mine has "been determined to hold meaningful amounts of valuable individual REEs with magnetic properties, the most important being neodymium and praseodymium as well as heavier HREEs such as terbium and dysprosium. Indeed, the mine may also be one of the most significant deposits of magnetic REEs discovered in the United States." According to Atkins' letter, "initial testing shows the Brook Mine site contains a range of approximately 640,000-800,000 tons of in place 100% TREO (total rare earth oxide) with no cutoff in concentration." (REEs are purified from rare-earth oxides, and mining reserves are quoted in terms of REO. "TREO" is the cumulative measurement of heavy REOs and light REOs, with "heavy" REOs relating to REEs with high atomic numbers – generally 62 and above – and "light" REOs relating to REEs with low atomic numbers – generally 57 to 61.)

42. On August 8, 2023, Ramaco announced that its "current Exploration Target is now up 50% to 0.9 – 1.2 million tons of total rare earth oxides ('TREOs') from an original Target in May of 0.6 – 0.8 million tons," and that "we now believe that 23% of deposits contain the primary magnetic rare earth oxides of Neodymium, Praseodymium, Dysprosium, and Terbium."

43. In October 2023, Ramaco commenced "overall mine development" at the Brook Mine with the "initial goal of obtaining additional quantities of rare earth material for chemical and metallurgical testing."

44. The Company's annual report for 2023 stated that

> Three drillhole programs involving a total of 123 new core drillholes specifically targeting rare earth elements (REEs) have been completed within the current Brook Mine permit area. So far, the results of these drilling programs indicate elevated levels of REEs, along with significant concentrations of other critical elements such as Yttrium, Gallium, and Germanium. Work is ongoing to evaluate the potential exploitation of these minerals within the current Brook Mine permit area.

45. Ramaco continued that process during 2024. On August 7, 2024, Ramaco announced that it had "recently engaged the Fluor Corporation to lead the preparation and completion of its techno economic analysis of the project before year-end 2024." Notably, Ramaco announced that Fluor "will also be engaged in the design and engineering for the demonstration processing facility which Ramaco anticipates constructing in 2025, which will initiate the commercial development of its rare earth and critical mineral deposit." Defendants reiterated on November 4, 2024, that Fluor's "preliminary techno-economic analysis" of the Brook Mine REE project was coming in "early December."

46. Ramaco's annual report on Form 10-K for 2024 stated that "[t]he Company continues to evaluate the commercial and technical feasibility of extracting critical minerals and rare earth elements within the current Brook Mine permit area. Preliminary findings indicate significant concentrations of critical minerals scandium, gallium, and germanium as well as rare

earth elements neodymium, praseodymium, dysprosium, and terbium." The 2024 10-K also stated that Ramaco "anticipates completing its techno-economic analysis of the overall commercial aspects of the potential opportunity *in 2025* and anticipates beginning construction of a demonstration processing facility in mid to late 2025," marking a delay in the completion of Fluor's analysis, which was previously expected by the end of 2024.

47. On March 10, 2025, Defendants disclosed that they expected to release Fluor's Preliminary Economic Analysis during the second quarter.

### E. Shortly Before the Class Period, Defendants Highlight Developments at the Brook Mine

48. On May 12, 2025, Defendants made a series of announcements regarding the Brook Mine. Defendants announced that Ramaco "intends to commence large scale carbon ore mining of the Brook Mine in June 2025," and that the Company would begin construction of a "pilot scale concentrate processing" by fall of 2025. Defendants also announced that

> Initial production of rare earth concentrates processed at pilot scale is expected to begin in 2026. The projected development timeline is that the pilot plant will be expanded to a full commercial scale facility late in 2026, with targeting of commercial-scale production of oxides in the second half of 2028

49. Thus, the construction and operation of a pilot plant to process REEs and CMs at the Brook Mine was a necessary precursor to "commercial-scale production."

50. Further, Defendants announced that the Company was hiring Defendant Woloschuk from Fluor "to oversee the Company's development of the Brook Mine and related commercialization of its rare earth and critical mining operations."

51. Defendants also released a revised Technical Report Summary ("TRS") prepared by Weir "in accordance with the U.S. Securities and Exchange Commission Regulation S-K 1300 for Mining Property Disclosure." This "May 2025 TRS" reported that the "the high range of Total Rare Earth Oxide ('TREO') is now estimated at approximately 1.7 million tons," of which

"roughly 0.3 million tons or 17% of the overall deposit" consisted of scandium, germanium and gallium. Defendants emphasized that "China has imposed significant export restrictions on these and other critical minerals and rare earth elements causing significant implications for global supply chains and U.S. strategic interests."

52. According to Defendants, "[b]ased on current resource data and planned processing capacity, the Company projects that the Brook Mine project will commercially produce approximately 1,400 metric tons of critical mineral oxides per year," and that approximately 40% of this production would "include purified oxides of seven REEs and CMs including neodymium (Nd), praseodymium (Pr), dysprosium (Dy), gallium (Ga), germanium (Ge), terbium (Tb), and scandium (Sc)." These seven oxides were expected to contribute over 95% of expected revenue and cash flow.

53. Notably, however, the May 2025 TRS did not reach any conclusion regarding the economic feasibility of the Brook Mine REE project. Rather, it stated that "there are still several issues to be addressed for one to conclude that prospects are reasonable for economically feasible extraction of the minerals at this time. Work is currently ongoing to address these issues." The "Economic Analysis" section of the May 2025 TRS stated only that "[a]n economic analysis related to this Exploration Target has not been developed."

54. The May 2025 TRS also stated that

> As a result of significant price increases for Scandium, Ramaco has resumed the inclusion of analyses for this mineral in its Inductively Coupled Plasma – Mass Spectrometry (ICP-MS) testing schema. Limited analyses for Scandium had previously been performed but were discontinued due to relatively low concentrations encountered and a relatively low price at the time.

55. However, there was no information regarding these purported "significant price increases for Scandium." Indeed, there was no information regarding pricing of any of the REEs or critical minerals detected at the Brook Mine. To the contrary, the "Market Studies" section of

the May 2025 TRS stated only that "[a] marketing study related to this Exploration Target has not yet been completed."

56. Without reliable pricing or an economic analysis, the economic feasibility of the Brook Mine project could not be assessed. Defendants reiterated, however, that they "anticipate[d] that before the end of the second quarter the Fluor Corporation will release results of its full Preliminary Economic Analysis ('PEA') of the project," explaining that "[t]he report has been delayed pending receipt of results from Hazen's testing laboratories. The Company will release a comprehensive overview of its overall development plans for its critical mineral operations once the PEA is released."[3]

57. Analysts were disappointed by Defendants' delay in releasing Fluor's PEA. An analyst report from Jefferies LLC highlighted that "[t]he official economic analysis from Fluor has been further delayed" and "we still do not have full project economics," while a Benchmark Company analyst report stated that "[w]e look forward to the PEA release and initial findings on project feasibility, economics, and capex."

3 "Hazen" refers to Hazen Research, Inc.

**F. Defendants Make a Series of Materially False and Misleading Statements During the Class Period, Artificially Inflating Ramaco's Stock Prices**

***i. July 1, 2025 Statements***

58. The Class Period begins on July 1, 2025. On that day, Defendants filed a Form 8-K with the SEC (the "July 1, 2025 Form 8-K") with four attachments, including: (i) a press release titled "***Independent*** Preliminary Economic Assessment Report from Fluor Corporation ***Confirms Commercial and Technical Feasibility*** of Ramaco's Brook Mine Rare Earth Deposit" (the "July 1, 2025 Press Release," which the Company also issued separately from filing it with the SEC); (ii) a letter to shareholders from Defendant Atkins (the "July 1, 2025 Atkins Letter"); and (iii) a "Brook Mine Rare Earth Project Preliminary Economic Assessment Summary" (the "July 1, 2025 PEA Summary").

**a. The July 1, 2025 Press Release**

59. The July 1, 2025 Press Release stated that Fluor had not yet delivered the full PEA to Ramaco. Rather, Ramaco had received only "summary results," and Fluor "will deliver a Full Preliminary Economic Assessment ('PEA') of Ramaco's Brook Mine on or before July 8, 2025."

60. Despite not having the full PEA in hand, Defendants stated in the July 1, 2025 Press Release that "[t]he Fluor PEA states that ***the project is both commercially and technologically feasible***." The press release emphasized several "Key Highlights," including the following:

- ***NPV & IRR:*** *The results of the Brook Mine PEA outline NPV8 (net present value using an 8% discount rate) of $1.197 billion and NPV10 (net present value using a 10% discount rate) of $898 million (pre-tax) and an IRR (internal rate of return) of 38% with a total initial capital cost estimate of $473 million (excluding a 22% capital expenditure contingency).*

- ***Annual Economics and Production:*** *The results of the Brook Mine PEA outline that based upon the current mine plan of a 2 million ton per annum production of coal that the adjusted EBITDA (see footnote for definition) from the rare earth and critical mineral operation would be $134 million by 2028. Steady state adjusted EBITDA of $143 million would be reached by 2029 on $378 million of annual revenue. At steady state, 1,242 annual short tons of*

> *oxide are projected to be produced, which include 456 tons of gallium, germanium, scandium, terbium, dysprosium, neodymium, and praseodymium. Given the size of the Brook Mine deposit, this level of both mining and processed oxide production is scalable.*[4]

61. The July 1, 2025 Press Release presented a revenue model that was represented to employ independently validated pricing, describing the price inputs as "long term rare earth and critical mineral pricing forecasts for domestic sourced materials obtained from industry sources." Purportedly based on these "industry sources," Fluor assigned scandium a price of $3,750,000 per metric tonne,[5] claiming it would generate $222 million in projected annual revenue and accounting for 59% of the project's total $378 million revenue forecast. NdPr was assigned a price of $130,000 per metric tonne, generating $30 million in revenue, with gallium contributing another $68 million at $770,000 per metric tonne.

62. These figures were the primary drivers of the projected EBITDA of $143 million and the $1.2 billion net present value ("NPV") of the Brook Mine. Because scandium alone accounted for 59% of projected revenue, the entire revenue model—and every economic metric derived from it, including EBITDA, NPV, IRR, and projected cash flow—stood or fell with Ramaco's assumptions around scandium price and market size.

63. The July 1, 2025 Press Release also stated that "[w]e believe that the ***[PEA] offers compelling new confirmation of the Brook Mine project's viability***. ***This independent evaluation*** not only validates Ramaco's current development strategy but also provides strong momentum to advance the project's next phases." To give more credence to the PEA, the July 1, 2025 Press Release quoted Defendant Atkins describing Fluor as "an internationally recognized ***independent*** engineering firm."

---

4 Italics and bold in original.

5 A metric tonne, or ton, is equal to 1,000 kilograms; Defendants used both metric tonnes and kilograms in statements regarding the Brook Mine.

64. As to the status of mining operations, the July 1, 2025 Press Release stated that

> Initial mining activities have commenced at the Brook Mine to procure representative ore for the upcoming pilot scale metallurgical testing. These efforts will support the construction and commissioning of an onsite pilot plant, targeted to begin in the fourth quarter of 2025. The on-site pilot plant will support commercial design and product development and is anticipated to be fully operational by mid-2026 to ship product to potential customers for testing.

65. The July 1, 2025 Press Release was materially false and misleading for several reasons. *First*, it was materially false and misleading to describe the Fluor PEA, or the conclusions set forth therein, as "independent." That characterization created the false impression that Fluor "independently" endorsed the product prices (including for scandium) supplied by Ramaco, which determined whether the project would be economically feasible. This was false; Fluor never concluded that the product prices supplied by Ramaco were reasonable or provided a basis to conclude that the project was economically feasible.[6]

66. *Second*, the July 1, 2025 Press Release was materially false and misleading because it represented that the Fluor PEA concluded that the Brook Mine REE project was "commercially and technologically feasible." In fact, the Fluor PEA – even incorporating the baseless product pricing supplied by Ramaco – merely concluded that it was *possible* that the project could be commercially and technologically feasible. The Fluor PEA did *not* conclude that the project was commercially and technologically feasible.

67. *Third*, the July 1, 2025 Press Release was materially false and misleading because it conveyed to investors that there was true industry interest in purchasing 65 tons of scandium annually at a price of $3,750,000 per metric ton, and that Defendants' scandium-heavy strategy for the Brook Mine was commercially feasible. In the context of a project that rested on the

---

6 In addition, Defendant Woloschuk, while overseeing the preparation of the purportedly "independent" Fluor PEA, was simultaneously in discussions with Defendants to join Ramaco as an employee.

placement of 65 tons of scandium annually, that representation carried great weight, because it addressed a fundamental challenge to the underlying economics, which was a lack of demand for that amount of scandium. In reality, as confirmed by multiple experts and Defendants' disclosures when they eventually abandoned this scandium-focused strategy, there was no basis for Defendants' scandium assumptions.

68. *Fourth*, the July 1, 2025 Press Release created a materially false and misleading impression of the state of construction and mining activity at the Brook Mine by stating that "[i]nitial mining activities have commenced" and that "construction and commissioning of an onsite pilot plant[ is] targeted to begin in the fourth quarter of 2025." As investors later learned from Wolfpack, almost no activity had taken place at the Brook Mine, and Defendants later disclosed that Ramaco did not even retain a vendor to design the pilot plant until late October 2025.

**b. The July 1, 2025 Atkins Letter**

69. The July 1, 2025 Atkins Letter reiterated that the Fluor PEA "concluded that the Brook Mine ***is both technically and commercially feasible***" and that it was on the "***bas[is] of Fluor's findings and recommendations of technical and commercial feasibility [that] Ramaco proceeded with mine development (which began in early June)*** to procure representative carbon ore for ongoing pilot-scale metallurgical testing."

70. In providing an update on the commercialization of oxides, the July 1, 2025 Atkins Letter represented that Ramaco tested the market and received encouraging signals:

> On our commercial path, ***we intend to shortly initiate discussions on supply and procurement arrangements for the sale of oxides with a host of potential domestic customers***. The range of possible customers includes both domestic corporations as well as governmental and defense related entities. We are encouraged that ***our initial outreach to potential customers indicates that the Brook Mine will be able to provide future supply arrangements for specific rare earths and critical minerals that are not currently available from existing domestic sources.***

71. As to "Project Economics," the July 1, 2025 Atkins Letter reiterated the same revenue expectations from the various rare earth elements as the press release, assigning scandium, gallium, and NdPr a price of $3,750 per kilogram, $770 per kilogram, and $130 per kilogram, respectively, yielding revenue of $222 million, $68 million, and $30 million, respectively. Rather than disclosing that the pricing assumptions, on which the revenue projections were based, were supplied by Ramaco itself, the letter made a vague reference to "industry sources."

72. The July 1, 2025 Atkins Letter was false and misleading for the same reasons as the July 1, 2025 Press Release.

73. In addition, the July 1, 2025 Atkins Letter provided investors with an estimate of Ramaco's Equity Value (EV) that was based on purportedly "comparable public company EV/EBITDA" that of MP Materials (NYSE: MP), a U.S. publicly traded company in commercial production of rare earth at scale in the United States. In defending the comparison, Ramaco focused on Brook Mine's commercial advantages, namely that its sedimentary material requires less energy-intensive crushing, the deposit does have negligible radioactivity, and the rare earth distribution is more balanced. Ramaco omitted from its comparison, however, the countervailing technical and economic challenges that the same geology created, namely that soft, low-grade sedimentary material has never been commercially processed for rare earths at scale, and that Brook Mine's total rare earth oxide ("TREO") content is approximately 150 times lower than that at Mountain Pass mined by MP Materials, which would require mining of enormously larger volume of material, offsetting any cost advantages yielded by the soft-clay mining.

74. Besides the technical differences, MP Materials was an operating company generating actual revenue from actual commercial production of separated rare earth oxides, with demonstrated processing capability, established offtake relationships, and a government

procurement contract for NdPr oxide, while Brook Mine had completed only bench-scale metallurgical testing on 12 leach tests over six months, had no pilot plant, no validated flowsheet, no prefeasibility study, no offtake agreements. Applying the premium EV/EBITDA multiple of a proven, producing, revenue-generating rare earth company (MP Material) to the projected EBITDA of a pre-development project resting on unvalidated cost estimates and self-supplied price assumptions (Ramaco) was false and misleading.

**c. The July 1, 2025 PEA Summary**

75. Ramaco did not publish the full PEA on July 1, 2025 (or ever).[7] Indeed, as previously noted, Ramaco had not even received the full analysis at that time. Instead, Ramaco published the July 1, 2025 PEA Summary, which stated that it was "internally prepared by Ramaco [] by redacting certain data, information and processes prepared by Fluor [] for Ramaco which we believe to be proprietary. . . in order to only summarize and protect such proprietary and confidential data, information and processes provided to Ramaco by Fluor." Defendants stated that "the summarization and redaction of the data, information and processes provided by Fluor as presented herein does not affect the overall findings and conclusions presented herein in the PEA Summary."

76. The July 1, 2025 PEA Summary incorporated the groundless scandium pricing assumptions set forth in the July 1, 2025 Press Release, and referred to scandium as a "high-value mineral," and was false and misleading for the same reasons as scandium-related statements in the

---

7 For context, in recent years, various companies commissioned PEAs for their mining projects, including Nevada Lithium, USA Rare Earth LLC, NovaCopper Inc., and i-80 Gold Corp, to name a few. Each of these companies disclosed the full PEAs to the public, unlike Ramaco, establishing that Ramaco's claim publishing the full Fluor PEA would compromise "proprietary and confidential, data, information, and processes" was baseless. Industry experts and commentators harshly criticized Ramaco's choice to not release the full PEA report. As one expert with 40 years in mining put it, as quoted in the Wolfpack Report, "[t]he fact that they didn't release the Fluor report tells me this is not economic."

July 1, 2025 Press Release and July 1, 2025 Atkins Letter. In addition, it repeated the NPV, IRR, and EBITDA metrics set forth in the July 1, 2025 Press Release, and thus was false and misleading for the same reasons as the July 1, 2025 Press Release. Finally, the July 1, 2025 PEA Summary stated that "Fluor concludes that there is a technically and economically viable pathway to production." This was materially false and misleading because it conveyed to investors that Fluor endorsed the economic viability of the Brook Mine REE project, which was false. Fluor did not conclude that the project was economically viable, even based on Defendants' groundless pricing assumptions.

***ii. The July 8, 2025 Press Release***

77. Fluor did not deliver its full PEA on or before July 8, 2025. Instead, on July 8, 2025, Ramaco issued a press release (the "July 8, 2025 Press Release") (which it also filed as an attachment to a Form 8-K filed that day) titled "Update on ***Independent*** Preliminary Economic Assessment Report from Fluor Corporation," announcing that

> on July 9 [Ramaco] will receive the Preliminary Economic Assessment (the "PEA") of Ramaco's Brook Mine from the Fluor Corporation. The PEA will be presented to the Ramaco Board of Directors (the "Board") at its Board meeting tomorrow. Following Fluor's presentation to the Board and the Board's opportunity to review, Ramaco expects to release a summary of the updated information to its website this week.

78. The July 8, 2025 Press Release was materially false and misleading because it characterized the Fluor PEA as "independent." That characterization created the false impression that Fluor "independently" endorsed the product prices (including for scandium) supplied by Ramaco, which determined whether the project would be economically feasible. This was false; Fluor never concluded that the product prices supplied by Ramaco were reasonable or provided a basis to conclude that the project was economically feasible.

### ***iii. The July 10, 2025 Press Release and PEA Summary***

79. On July 10, 2025, Ramaco filed a Form 8-K with the SEC (the "July 10, 2025 Form 8-K"), attaching (i) a press release titled "Ramaco Releases Summary of ***Independent*** Preliminary Economic Assessment Report from Fluor Corporation" (the "July 10, 2025 Press Release", which the Company also issued separately from filing it with the SEC) and (ii) a "Summary of Brook Mine Rare Earth Project Preliminary Economic Assessment (PEA) Report" (the "July 10, 2025 PEA Summary").[8]

80. The July 10, 2025 Press Release was materially false and misleading because it characterized the Fluor PEA as "independent." That characterization created the false impression that Fluor "independently" endorsed the product prices (including for scandium) supplied by Ramaco, which determined whether the project would be economically feasible. This was false; Fluor never concluded that the product prices supplied by Ramaco were reasonable or provided a basis to conclude that the project was economically feasible.

81. The July 10, 2025 Press Release quoted Defendant Atkins as stating that "[w]e are very pleased with the results in the full PEA from Fluor and their presentation to our Board" and that ***"[t]he results confirm the Brook Mine is both commercially and technologically feasible."*** Documents filed in another litigation confirm that Defendant Atkins received the full Fluor PEA by email on July 10, 2025. In addition, Defendant Atkins was a member of the Board and thus received the presentation to the Board referenced in the press release.

82. Like Ramaco's prior PEA summary released on July 1, 2025, the July 10, 2025 PEA Summary was Ramaco's own "internally prepared" summary, which "redact[ed] certain data, information, and processes included in the Preliminary Economic Assessment report (PEA Report)

[8] Though this document is dated July 9, 2025 on its face, it is referred to herein as the July 10, 2025 PEA Summary because it was released to investors and filed with the SEC on that date.

prepared by Fluor Corporation (Fluor) for Ramaco that are considered by Ramaco to be proprietary." Defendants assured investors that "the summarization and redaction of certain data, information, and processes presented in the PEA Report do not affect the overall findings and conclusions of the PEA Report or this PEA Summary." As Defendants later stated, the July 10, 2025 PEA Summary "was released in accordance with the disclosure framework of Regulation S-K Subpart 1300."

83. Like the July 10, 2025 Press Release, Ramaco's July 10, 2025 PEA Summary stated that "Fluor conclude[d] that the Brook Mine Rare Earth Project is both technically and economically viable."

84. This was materially false and misleading because it represented that the Fluor PEA concluded that the Brook Mine REE project was "technically and economically viable." In fact, the Fluor PEA – even incorporating the baseless product pricing supplied by Ramaco – merely concluded that it was *possible* that the project could be commercially and technologically feasible. The Fluor PEA did *not* conclude that the project was commercially and technologically viable. It was also false and misleading because it conveyed to investors that there was true industry interest in purchasing 65 tons of scandium annually at a price of $3,750,000 per metric ton, and that Defendants' scandium-heavy strategy for the Brook Mine was commercially feasible. In the context of a project that rested on the placement of 65 tons of scandium annually, that representation carried great weight, because it addressed a fundamental challenge to the underlying economics, which was a lack of demand for that amount of scandium. In reality, as confirmed by multiple experts and Defendants' disclosures when they eventually abandoned this scandium-focused strategy, there was no basis for Defendants' scandium assumptions.

85. In addition, the July 10, 2025 PEA Summary stated that "[a] financial model was developed to support Ramaco's evaluation of the Brook Mine Rare Earth project's potential viability. The model was created collaboratively by Fluor and Ramaco and endorsed by the company's Chief Financial Officer (CFO)," i.e., Defendant Sussman. The July 10, 2025 PEA Summary also contained additional process design criteria, plant uptime, hours, design life, annual production target.

86. The July 10, 2025 PEA Summary noted that "[a] key component of the financial model is the pricing of the end products" and that "product pricing and rare earth oxide (REO) and critical mineral oxide (CMO) recovery rates are the most influential factors affecting" the internal rate of return of the project. With respect to such pricing, it stated that "Ramaco developed a long-term pricing model for rare earth products, *supported by various industry sources*," and that "Ramaco provided a detailed price list for each of the rare earth and critical mineral oxide products, reflecting current market conditions."

87. Like the July 1, 2025 PEA Summary, the financial model described in the July 10, 2025 PEA Summary reflected pricing of $770,000 per metric ton of gallium and $3,750,000 per metric ton of scandium. Further, the July 10, 2025 PEA Summary emphasized that *"[s]candium alone* ***is expected*** *to contribute 59% of total revenue*, while Scandium, Gallium, and Germanium combined could account for up to 83% of projected revenue, underscoring their central role in the project's financial success."[9] Indeed, "***[t]he presence of these high-value elements is a key differentiator for the Brook Mine project and a major driver of its economic potential***," according to the July 10, 2025 PEA Summary.

[9] The 59% revenue contribution of scandium set forth in the July 10, 2025 PEA Summary totaled $222 million.

88. The statements in paragraphs 85-87 were materially false and misleading because they conveyed to investors that there was true industry interest in purchasing 65 tons of scandium annually at a price of $3,750,000 per metric ton, and that Defendants' scandium-heavy strategy for the Brook Mine was commercially feasible. In the context of a project that rested on the placement of 65 tons of scandium annually, that representation carried great weight, because it addressed a fundamental challenge to the underlying economics, which was a lack of demand for that amount of scandium. In reality, as confirmed by multiple experts and Defendants' disclosures when they eventually abandoned this scandium-focused strategy, there was no basis for Defendants' scandium assumptions.

89. \To date, Ramaco has not published the full Fluor PEA to investors on its website or by filing it with the SEC. After the Class Period, Ramaco submitted the full Fluor PEA as an exhibit in an unrelated litigation on April 3, 2026, and the document was filed on the public docket for that action on April 7, 2026. *See* Plaintiffs' Exhibit 17A, ECF No. 36-1, *Ramaco Carbon LLC et al. v. Moyes*, Case No. 2:26-cv-00104 (D. Wyo. Apr. 7, 2026).

***iv. After Defendants' Misstatements, Ramaco Holds a "Groundbreaking" Ceremony at the Brook Mine and its Stock Price Rises***

90. On July 11, 2025—one day after Ramaco received the full Fluor PEA—Ramaco hosted a landmark ribbon cutting and "groundbreaking" ceremony to, as it stated in a press release, "commemorate the opening of the Brook Mine . . . the first new rare earth mine in the United States in more than 70 years and first coal mine in Wyoming in over 50 years." Ramaco "themed" the event "American Independence: A Rare Earth Revolution" to echo the White House administration's agenda around REEs and CMs. The event took place at Ramaco's iCAM Technology Center in Ranchester, Wyoming and was attended by prominent governmental

officials, including U.S. Secretary of Energy Chris Wright, Wyoming Governor Mark Gordon, U.S. Senators John Barrasso and Cynthia Lummis, U.S. Representative Harriet Hageman and former U.S. Senator Joe Manchin, who previously joined Ramaco's Board on April 18, 2025.

91. Ramaco put on an elaborate show, bringing in heavy machinery to create the false impression that construction was active and underway, as shown by the following photo from news coverage of the groundbreaking:




92. On July 15, 2025, Jefferies raised its price target for Ramaco's Class A common stock from $15 to $27 per share, an 80% increase, while reiterating its Buy rating, titling the report "Ramaco Rallies on Brook Mine Value." The upgrade was driven by a sum-of-the-parts analysis that assigned $13.67 per share of value to the Brook Mine rare earth project and $12.77 per share to the coal business, making the rare earth project essentially equal in value to the entire legacy coal operation that Ramaco had spent over a decade building. The analyst report's discussion of the value of the Brook Mine REE project emphasized Ramaco's summaries of the Fluor PEA, and included, as an exhibit, a table listing the Ramaco-supplied prices used in the PEA (including for scandium) and the resulting revenues.

93. The Jefferies price target increase reflected the Company's climbing stock price, which had increased from $13.14 at the close of trading on June 30, 2025—the day before the Class Period—to $21.94 at the close of trading on June 15, 2025. Notably, though the stock price did not rise immediately after the issuance of Defendants' July 1, 2025 misstatements, as that information was digested by the market—which was awaiting Ramaco's receipt of the full Fluor PEA—the price of Ramaco's Class A and Class B common stock began rising significantly after the July 10, 2025 Press Release and July 10 PEA Summary.

***v. July 23–24, 2025 Senior Notes Offering***

94. Defendants wasted no time raising money from a market misled by their misstatements regarding the Brook Mine. On July 23, 2025, less than two weeks after the ribbon-cutting ceremony, Ramaco announced a registered public offering of 8.250% Senior Notes due 2030 (the "Notes") at an offering of $25.00 per Note, which was 100% of the principal amount of each Note (the "Notes Offering"). That day, July 23, 2025, Ramaco filed a preliminary prospectus supplement and prospectus on Form 424(b)(5) (the "Notes Preliminary Prospectus"). The following day, July 24, 2025, Ramaco filed a final prospectus supplement and prospectus on Form 424(b)(5) (the "Notes Prospectus"), which supplemented a shelf registration statement that Ramaco previously filed on Form S-3 and was declared effective on September 29, 2023 (the "Registration Statement"). The Notes Prospectus supplemented and formed a part of the Registration Statement.

95. The Notes Offering raised gross proceeds of approximately $57 million, which Defendants secured from investors after making misstatements that artificially inflated the price of Ramaco's common stock.

96. The Notes Prospectus stated that the proceeds of the Notes Offering would be used for, among other things, "funding the acceleration of rare earth development." The Notes Prospectus further stated that "[a]s of June 2025, we have proceeded with mine development of our rare earth element and critical mineral Brook Mine near Sheridan, Wyoming to procure representative material for pilot-scale testing," and that "[w]e had a ribbon cutting at our carbon ore and rare earth mine, the Brook Mine, on July 11, 2025 *and development of this mine is proceeding*."

97. These statements misleadingly portrayed that the development of the Brook Mine was proceeding when, in fact, as the Wolfpack Report later disclosed on October 23, 2025, no significant activity took place at the Brook Mine after the ribbon-cutting ceremony on July 11, 2025.

***vi. July 29, 2025 Press Release***

98. On July 29, 2025 Ramaco issued a press release (the "July 29, 2025 Press Release") (attached as an exhibit to a Form 8-K filed with the SEC that same day) announcing that the Brook Mine had received a second five-year mine permit approval from the Wyoming Department of Environmental Quality. The July 29, 2025 Press Release stated that this permit "provides stakeholders with confidence in Ramaco's ability to develop the Brook Mine and progress towards its operational milestones," and described the July 11 groundbreaking ceremony as commemorating "the opening of the Brook Mine Carbon Ore Rare Earth project, the first new rare earth mine in the United States in more than 70 years," and stated that construction of the pilot-scale processing facility, supported by a $6.1 million Wyoming Energy Matching Fund grant, was "planned to begin later this year." The July 29, 2025 Press Release was materially false and misleading by conveying that the mine was "in the initial stages of production" and "progress[ing]

towards its operational milestone" even though, as Wolfpack's site surveillance would later document, no significant activity was occurring at the mine.

***vii. July 31, 2025 Press Release***

99. On July 31, 2025, Ramaco issued a press release announcing its financial and operating results for the second quarter of 2025 (the "July 31, 2025 Press Release"). The July 31, 2025 Press Release stated, in relevant part:

> - ***The Company commenced mining of the Brook Mine in June 2025. Tonnage is being mined*** in order to provide feedstock for testing in the Company's pilot plant which will optimize the ultimate processing and refinement of rare earth and critical mineral concentrates into oxides. ***Construction of this pilot scale processing facility will commence this Fall, with initial production of concentrates processed at pilot scale expected to begin in 2026***.
> - At the request of the U.S. Government, the projected commercial timeline for the rare earth and critical minerals operation has been accelerated versus the comments in our first quarter of 2025 earnings release. The disclosed Summary of the Fluor Corporation's ("Fluor") July 2025 Preliminary Economic Assessment ("Summary PEA"), ***states that initial commercial production is now anticipated in 2027 versus 2028 previously***.
> - The results of the Summary PEA outline NPV8 (net present value using an 8% discount rate) of $1.197 billion and NPV10 (net present value using a 10% discount rate) of $898 million (pre-tax) and an IRR (internal rate of return) of 38% with a total initial capital cost estimate of $473 million (excluding a 22% capital expenditure contingency).
>
> * * *
>
> Focusing on our rare earths, there are several transitional advantages and opportunities associated with the development of the Brook Mine:
>
> - The mine is already permitted and ***indeed mining has commenced.*** In July 2025, Ramaco received a 5-year mining permit renewal from the Wyoming Department of Environmental Quality.

100. These statements in the July 31, 2025 Press Release were materially false and misleading, conveying a false impression about the status and progress of mining and construction of the pilot plant at the Brook Mine, and the resulting timeline for commercial production. As investors later learned from Wolfpack, almost no activity had taken place at the Brook Mine, and

Defendants later disclosed that Ramaco did not even retain a vendor to design the pilot plant until late October 2025. Thus, it was false and misleading to state that mining had commenced and that "tonnage" was being mined, that pilot plant construction would begin in the fall, and that, as a result, commercial production would begin in 2027.

***viii. August 1, 2025: 2Q25 10-Q***

101. On August 1, 2025, the Company filed its quarterly report for the period ended June 30, 2025 on Form 10-Q with the SEC, signed by Defendants Atkins and Sussman (the "2Q25 10-Q"). The 2Q25 10-Q stated that:

> On July 10, 2025, the Company released a summary of the full ***independent*** Preliminary Economic Assessment ("PEA") for the Company's Brook Mine, prepared by Fluor Corporation ("Fluor"), ***in accordance with the U.S. Securities and Exchange Commission Regulation S-K 1300 for Mining Property Disclosure***. ***The Fluor PEA states that the project is both commercially and technologically feasible***.

102. The 2Q25 10-Q further stated that Ramaco "in conjunction with Fluor Corporation, has completed its preliminary economic assessment that ***demonstrates the viability of commercial development of rare earth and critical minerals processing."*** This statement, and the statement that the Fluor PEA "states that the project is both commercially and technologically feasible," were both materially false and misleading because the Fluor PEA – even incorporating the baseless product pricing supplied by Ramaco – merely concluded that it was *possible* that the project could be commercially and technologically feasible. The Fluor PEA did *not* conclude that the project was commercially and technologically feasible.

103. In addition, the 2Q25 10-Q was materially false and misleading by describing the Fluor PEA, or the conclusions set forth therein, as "independent." That characterization created the false impression that Fluor "independently" endorsed the product prices (including for scandium) supplied by Ramaco, which determined whether the project would be economically

feasible. This was false; Fluor never concluded that the product prices supplied by Ramaco were reasonable or provided a basis to conclude that the project was economically feasible.

104. Further, it was materially false and misleading for the 2Q25 10-Q to state that Ramaco's July 10, 2025 PEA Summary was "in accordance with the U.S. Securities and Exchange Commission Regulation S-K 1300 for Mining Property Disclosure." This was false, as the July 10, 2025 PEA Summary violated SEC Regulation S-K 1300 in multiple respects.

105. *First*, Item 1303(b)(3)(iv) requires that each mineral resource estimate be "based on a reasonable and justifiable price selected by a qualified person pursuant to § 229.1302(d) or (e)." Item 1302(d)(2) requires the qualified person to "use a price for each commodity that provides a reasonable basis for establishing the prospects of economic extraction" and to "disclose the price used and explain, ***with particularity***, his or her reasons for using the selected price, including the material assumptions underlying the selection." The July 10, 2025 PEA Summary did not employ a "reasonable and justifiable price" for scandium and did not "explain, with particularity, [the] reasons for using the selected price [for scandium], including the material assumptions underlying the selection."

106. *Second*, Item 1302(d)(1)(i)(B) permits a qualified person to determine the existence of a mineral resource only upon concluding that "there are reasonable prospects for economic extraction" based on an initial assessment. Neither Defendants nor Fluor reached this conclusion. The Fluor PEA concluded only that there was a "pathway" to economically viable production, and did not even include mining costs in the analysis.

107. *Third*, because the July 10, 2025 PEA Summary purported to make conclusions regarding the economic feasibility of the Brook Mine REE Project, it was required by Item 601(b)(96)(iii)(B)(19)(iii) to include "sensitivity analysis results using variants in commodity

price, grade, capital and operating costs, or other significant input parameters," and by Item 601(b)(96)(iii)(B)(19)(ii) to disclose the results of the economic analysis, including annual cash flow forecasts. The summary contained neither, and for good reason. Any sensitivity analysis run at actual scandium transaction prices of $700–1,100 per kilogram—rather than the fabricated $3,750—would have compelled a conclusion that Defendants' scandium-centric strategy was not economically feasible.

108. *Fourth*, the Brook Mine REE resources discussed by the July 10, 2025 PEA Summary were "inferred" mineral resources—the lowest-confidence category under Regulation S-K 1300. Item 1302(d)(1)(iii)(B) permits a qualified person to designate inferred mineral resources *only* where the qualified person has "a reasonable expectation that the majority of inferred mineral resources could be upgraded to indicated or measured mineral resources with continued exploration" and "[s]hould be able to defend the basis of this expectation before his or her peers." Neither the July 10, 2025 PEA Summary nor the full Fluor PEA reached this conclusion.

109. In addition, the 2Q25 10-Q purported to warn investors of certain risks, which the Company described as factors that "may" adversely affect Ramaco's prospect and financial condition, including the following:

> ***Changes in the level of demand for, and the market price of*** (including taxes and other tariffs and fees imposed upon) ***rare earth and critical minerals could significantly affect our growth prospects,*** which depend in large part on our ability to successfully develop the Brook Mine into a producing mine. As is the case with any mining asset that is not yet in commercial production, there is no assurance that we will be able to successfully develop the Brook Mine into a commercial scale mine. ***In particular, the prices for rare earth and critical minerals may fluctuate and are likely to be affected by numerous factors beyond our control*** such as interest rates, exchange rates, taxes, inflation, fluctuation in the relative value of the U.S. dollar against foreign currencies, shipping and other transportation and logistics costs, global and regional supply and demand for rare earth minerals and

> products, potential industry trends and the political and economic conditions of countries that produce and procure rare earth and critical minerals….
>
> * * *
>
> … Chinese competitors may engage in predatory pricing or other behaviors designed to inhibit competition. Any increase in the amount of rare earth products exported from ***China or other nations and increased competition may adversely affect our ability to develop Brook Mine into an economically feasible producing mine*** or, in the future, our ability to ultimately profitably recover and sell rare earth and critical minerals, which could adversely impact our growth prospects and the price of our common stock.

110. These risk disclosures were materially false and misleading because they described certain market conditions that already existed as hypothetical future risks outside of the Company's control. For example, the scandium market was already only $25 million annually and western-friendly scandium oxide was already trading below $1,100 per kilogram. Gallium and NdPr likewise had established prices in the commodities market that Ramaco entirely disregarded. Framing known existing conditions as future possibilities was itself false and misleading because it created the impression that the adverse scenarios are merely some of many possible outcomes. Additionally, Ramaco's boilerplate disclosures, including those that China dominates the supply, that they may engage in predatory pricing, that prices may fluctuate, and that macroeconomic factors could impact demand are so boilerplate and generic that they apply to any company trading in any commodity. Indeed, the scandium problem was not a problem of China's monopoly, but rather a problem of low prices and insufficient global demand. These omissions, if disclosed would have caused reasonable investors to question the economic foundation of Ramaco's $5 billion NPV, the 38% IRR, and the $143 million EBITDA that was driving Ramaco's stock to its new highs and forming the basis of analysts' price target increases.

111. Pursuant to the Sarbanes-Oxley Act of 2002, Defendants Atkins and Sussman certified that the 2Q25 10-Q "does not contain any untrue statement of a material fact or omit to

state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that the Company had adequate and sufficient internal controls over financial reporting. This was materially false and misleading because, as set forth above, the 2Q25 10-Q contained numerous material misstatements.

***ix. August 1, 2025 Earnings Call***

112. On the same day they released the 2Q25 10-Q (August 1, 2025), the Company hosted an earnings call concerning the Company's financial and operating results for the second quarter of 2025. All four Individual Defendants presented during the call. Defendant Atkins first gave an update on the mining activity at the Brook Mine, stating as follows:

> ***The mine is fully permitted. We began full scale mine operations this June. We expect to begin pilot plant operations to take our ore to oxide this fall.*** And we will use our pilot operations to optimize the processing techniques for roughly about nine months, which will then assist in the design engineering for our full commercial oxide facility. We hope to transition to construction of the full commercial facility by late next year. And dependent upon some potential acceleration on timing, ***we would expect to be in commercial oxide production and sales by 2028 or hopefully sooner.***

113. Atkins' statements about "full scale mine operations" and the beginning of "pilot plant operations"—and the resulting timeline for "commercial oxide production and sales"—were materially false and misleading because, as investors later learned from Wolfpack, almost no activity had taken place at the Brook Mine, and Defendants later disclosed that Ramaco did not even retain a vendor to design the pilot plant until late October 2025.

114. Defendant Woloschuk reiterated these representations, stating that "we commenced mining in June, so that significantly reduces the development timeline of the project," and offered an update regarding potential customers:

> Looking ahead, my main focus is working to accelerate the timeline to reach commercial production. As Randy intended, ***we plan to rapidly construct our pilot facility so that we can begin pilot operations this fall to take our ore to oxide product.*** This will allow potential customers to test our products for quality control. Whether it be the Department of Defense or a defense contractor or any other potential customer, any agreed upon long-term offtake will be subject to meeting certainly quality specifications. ***So we view the acceleration of the pilot plant as the crucial next step on the path to commercialization.***

115. Woloschuk then confirmed that Ramaco "remain[s] on track for commercial oxide production in 2027."

116. Woloschuk's statements about construction of the pilot plant and the resulting operations and commercialization, representing that those steps were "accelerat[ing]," were materially false and misleading because, as investors later learned from Wolfpack, almost no activity had taken place at the Brook Mine, and Defendants later disclosed that Ramaco did not even retain a vendor to design the pilot plant until late October 2025.

117. Defendant Blanchard, Executive Vice President for Mine Operations, confirmed the Brook Mine was "***activated in June*** in advance of our mine opening ceremonies on July 11" and that "the mine opening and the ***initial mining stage were brought in under budget [and] ahead of the schedule.***"

118. Blanchard's statements regarding "the mine opening and the initial mining stage," including that the mine was "ahead of the schedule," were materially false and misleading because, as investors later learned from Wolfpack, almost no activity had taken place at the Brook Mine, and Defendants later disclosed that Ramaco did not even retain a vendor to design the pilot plant until late October 2025, and thus Ramaco was *behind* schedule for development of the mine.

119. Defendant Sussman then delivered the financial centerpiece, expressing excitement over a financial fundamentals surrounding the Brook Mine REE projects, including the pre-tax ***NPV of $1.2 billion at an 8% discount rate, an IRR of 38%, and projected steady-state EBITDA***

***of $143 million by 2029*** — numbers drawn directly from the Fluor PEA that Ramaco itself provided — adding that "***given the multiples on rare earth names***, needless to say, we're incredibly excited about the potential of this business."

120. Sussman's statements regarding the economic prospects of the Brook Mine REE project repeated the metrics set forth in the in the July 1, 2025 Press Release, July 1, 2025 Atkins Letter, and Ramaco's two summaries of the Fluor PEA, and thus were materially false and misleading for the same reason as those other documents.

121. In response to a question from a Benchmark Company analyst about any price floors for any of the critical minerals that Defendants touted from the Brook Mine, Defendant Atkins stated that the MP Materials deal "***is somewhat of a template … an important one***," remarking that the government has to "step in to help support private industry in that respect, and that's in a variety of means." This was materially false and misleading. Atkins failed to disclose that the MP Materials deal was fundamentally inapt as a "template" for Brook Mine: MP Materials operated a fully producing rare earth mine with established processing capabilities and a proven NdPr magnet supply chain critical to national defense, while Brook Mine remained an unproven, pre-revenue project whose economic viability had not been independently validated and whose flagship rare earth revenue projections rested on Ramaco-supplied unsubstantiated pricing assumptions.

122. The analyst questioned Ramaco executives on the assumption underlying the financial model of the PEA—that Ramaco could sell 65 tons of scandium per year at $3,750 per kilogram into a market whose entire global consumption is roughly 35 tons per year—barely half the volume Ramaco claimed it would sell. Thus, if Ramaco mined 65 tons annually, the market price would collapse.

123. Rather than acknowledging these constraints, Woloschuk claimed that Ramaco could create demand and referenced "several sources":

> We had reports from EY. They conducted a study a few years ago that is suggesting scandium demand is growing -- potentially grow to 450 tons a year by 2030 and possibly over 1,000 tons a year. ***So we have several sources, government sources and marketing studies conducted that would suggest if we can produce scandium in the U.S., there will be a market for it***.

124. Defendants have not produced or substantiated the sources that allegedly justified their scandium price and market assumptions.

125. Defendant Sussman also remarked that the projections were "three years out" and pointing to periods when scandium had traded "significantly higher":

> [I]n terms of the price deck really across the board. So, first of all, ***this is three years out. So this is not pricing as of today.*** Second of all, these are western pricing. Obviously, at the time going back to the NdPr pricing we were using, it was significantly higher than spot. And then, of course, ***MP signed an offtake deal pretty close to what was being used in the price deck.*** Third is we've looked at sort of where prices have been historically. And certainly, there have been periods where scandium's been significantly higher than the price that we use and that's certainly true for all of the MVPs. And then ***last but not least, as Randy said, we've had incomings from customers***. ***So, again, we're not going to share the specifics of that. But we certainly have a good feel of what they're willing to pay over the – for a long-term secured domestic supply.***

126. Defendant Atkins further stated that, based on conversation with a "major customer," if Ramaco could "secure domestic supply of a specific type of rare earth, ***the market would be 6x what it is today***."

127. Defendants' statements regarding scandium in paragraphs 121-126 were materially false and misleading because they conveyed to investors that there was true industry interest in purchasing 65 tons of scandium annually at a price of $3,750,000 per metric ton, and that Defendants' scandium-heavy strategy for the Brook Mine was commercially feasible. In the context of a project that rested on the placement of 65 tons of scandium annually, that representation carried great weight, because it addressed a fundamental challenge to the underlying

economics, which was a lack of demand for that amount of scandium. In reality, as confirmed by multiple experts and Defendants' disclosures when they eventually abandoned this scandium-focused strategy, there was no basis for Defendants' scandium assumptions.

128. During the earnings call, Defendants presented an Investor Presentation of slides, which emphasized the "economic[ ] viability" of the Brook Mine. The presentation provided a summary of "Fluor's Preliminary Economic Assessment," highlighting the 38% IRR over 5 years, and stated that ***"Fluor concludes that the Brook Mine Rare Earth Project is technically and economically viable."***

129. These statements in the Investor Presentation were materially false and misleading because the Fluor PEA did *not* conclude that the Brook Mine REE project was commercially and technologically feasible. In fact, the Fluor PEA – even incorporating the baseless product pricing supplied by Ramaco – merely concluded that it was *possible* that the project could be commercially and technologically feasible. In addition, the statement that the Brook Mine REE project was economically viable was materially false and misleading because it was based on Defendants' groundless assumptions regarding pricing and demand for scandium.

***x. August 5–7, 2025 Equity Offering***

130. On August 5, 2025—four days after the earnings call at which Ramaco executives were pushing the scandium narrative—Ramaco filed an automatic shelf registration statement on Form S-3 for the sale of securities. On August 6, 2025, Ramaco filed a preliminary prospectus supplement and prospectus on Form 424(b)(5) for a secondary offering of Class A common stock (the "SPO Preliminary Prospectus"). The following day, August 7, 2025, Ramaco filed a final prospectus supplement and prospectus on Form 424(b)(5) for the sale of 10,666,667 shares of Class A common stock to the public at $18.75 per share (the "SPO Prospectus"), which

supplemented the shelf registration statement that Ramaco previously filed on August 5, 2025. The SPO Prospectus supplemented and formed a part of the August 5, 2025 registration statement.

131. This secondary stock offering (the "August SPO") raised gross proceeds of approximately $200 million. The prospectus supplement stated that Ramaco "intend[ed] to use the net proceeds from the sale of our Class A common stock in this offering to fund the acceleration of our development of our rare earth elements and critical minerals project."

132. The SPO Prospectus incorporated by reference, among other documents, the 2Q25 10-Q and the Form 8-Ks (and thus their attached press releases) filed on July 29 and 31, 2025, and thus made anew the misstatements in those documents. The SPO Prospectus carried the false Brook Mine narrative directly into the market for new shares. The SPO Prospectus assured investors that, following the July 11, 2025 ribbon-cutting, "development of this mine and overall project is proceeding"; and cited Weir as an expert for the estimated quantities and quality of resources and the "Rare Earth Element (REE) exploration target for the Brook Mine property." Defendants thus raised another $200 million from investors on the basis of material misstatements regarding the Brook Mine.

***xi. August 5, 2025 Analyst Reaction***

133. The Benchmark Company's August 5, 2025 analyst report — published four days after the Q2 earnings call — illustrates that analyst coverage of Ramaco had become dependent on the Brook Mine narrative. Despite reporting a Q2 EBITDA miss, cutting full-year 2025 EBITDA estimates from $70 million to $52 million, and sitting 33% below consensus on full-year EBITDA projections, analyst Nathan Martin nonetheless raised his price target from an earlier figure to $24 per share and maintained his Buy rating. The justification was explicit: Benchmark's sum-of-the-parts valuation incorporated the Fluor PEA findings (as "summarized" by Ramaco)

into a discounted cash flow analysis, meaning the price target was structurally dependent on Brook Mine delivering the economics that Ramaco's management had presented on the earnings call just days earlier.

***xii. September 4, 2025 Press Release***

134. On September 4, 2025, Ramaco issued a press release (the "September 4, 2025 Press Release") (attached as an exhibit to a Form 8-K filed with the SEC that day), announcing that it had formally retained Hatch Ltd. ("Hatch") to "spearhead the development of the Brook Mine's Pre-Feasibility Study (PFS), including test-work support, pilot plant design, and process flowsheet optimization." The September 4, 2025 Press Release referred to the Fluor PEA as "***confirming the project is both commercially and technologically feasible***" and stated that the Fluor PEA and the September 2025 TRS—which had not yet been released—both "***have validated Ramaco's development strategy*** and paved the way for development of the first new rare earth mine and refining project in the United States history since 1952."

135. These statements regarding the Fluor PEA and the September 2025 TRS were materially false and misleading because they represented that both studies concluded that the Brook Mine REE project was "commercially and technologically feasible." In fact, the Fluor PEA – even incorporating the baseless product pricing supplied by Ramaco – merely concluded that it was *possible* that the project could be commercially and technologically feasible. The Fluor PEA did *not* conclude that the project was commercially and technologically feasible. Further, the September 2025 TRS relied on the baseless scandium pricing employed in the Fluor PEA, and thus was materially false and misleading as to the economic feasibility of the Brook Mine REE project. In addition, the September 2025 TRS falsely purported to accord with SEC Regulation S-K Item 1300, though it violated that regulation in several major respects, as further set forth below.

***xiii. September 18, 2025 Statements***

136. On September 18, 2025, Ramaco issued a letter to stockholders from its Chairman and Chief Executive Officer, Defendant Atkins (the "September 18, 2025 Atkins Letter") (attached as an exhibit to a Form 8-K filed with the SEC that day), announcing a dramatic scale-up of the Brook Mine project, increasing the planned base coal production level from 2 million short tons[10] per year to 5 million short tons per year, which implied a nearly threefold increase in rare earth and critical mineral oxide production from approximately 1,366 tons per year to 3,400 tons per year. The company simultaneously revised its NPV estimate upward from $1.6 billion to $5.1 billion, representing a 219% increase, and has increased its EBITDA and revenue by 286% and 175%, respectively, versus the Fluor PEA. The updated calculations were based on the same product pricing assumptions as in the Fluor PEA. Ramaco executives attributed the expansion directly to requests from the U.S. government. As to the mining operations at the Brook Mine, Atkins assured investors that Ramaco has "***launched our fall drilling program at the Brook Mine, with two rigs now operating to complete 15 new holes before winter weather sets in***. This program will expand the reach of the deposit and to continue upgrading the quality of our defined resource."

137. On the same day, Ramaco released the TRS prepared by Weir regarding the Brook Mine (the "September 2025 TRS"). The financial models incorporated into the September 2025 TRS were based on data and information Ramaco provided itself, including the same product pricing assumptions used in the Fluor PEA, including a price scandium for $3,750 per kilogram; gallium for $770 per kilogram; and NdPr for $130 per kilogram. The September 2025 TRS noted

[10] A short ton is a unit of weight equal to 2,000 pounds (approximately 907 kilograms). It is the standard "ton" used in the United States, as distinguished from a "long ton," which is 2,240 pounds (~1,016 kg) or a metric ton, which is 2,204.6 pounds (1,000 kg).

that "mineral sales prices and market conditions" were among the primary factors affecting whether Ramaco could "achieve production and financial projections."

138. Defendants attempted to justify their market and pricing assumptions by referencing unnamed and undated "third-party independent marketing studies available in the public domain," as well as "Ramaco's meetings with potential off-takers on western premium pricing projections," and "Ramaco's meetings with off-takers who provided pricing on recent actual western trades." *See* TRS at 94. As to scandium specifically, Ramaco assumed it would trade at a western premium price consistent with other rare earths despite that no detailed market studies or material supply contracts supported such conclusion:

> Currently, there is no large scale reliable western supply of scandium in the world with most scandium oxide coming from China. ***Ramaco indicates its belief that if there were a reliable western index for scandium, it would trade at similar premiums vs Chinese pricing as discussed above. Independent third-party projections show scandium oxide demand growing to >450 tons a year by 2030.*** Ramaco estimates that Al-Sc adoption in the aerospace industry could require over 100 tons per year of scandium from the airline industry alone alone [sic]. In the past, scandium prices have reached $10 million per ton.

139. Weir dedicated a single page of the 116-page report to justifying scandium's premium price expectation. Weir noted that its conclusions as to the "economic mineability" of the project were based on direct comparison of operating costs and revenues on a per-unit basis, as provided in the previously commissioned PEA study. Based on those same assumptions, Weir concluded that "***economic viability is demonstrated***" and that the "***project, as currently envisioned, can generate positive cash flow from operations***." Thus, the TRS's conclusion of "economic mineability"—like the PEA's NPV, IRR, revenue, and cash-flow projections before it—was wholly derivative of Ramaco's fabricated scandium pricing and market assumptions, resting on unnamed and undated "marketing studies" and undocumented "meetings with potential off-takers."

### *xiv. The September 2025 TRS Failed to Comply with SEC Regulation S-K 1300*

140. The SEC's mining-property disclosure rules, codified at subpart 1300 of Regulation S-K, 17 C.F.R. §§ 229.1300–1305, and Item 601(b)(96) of Regulation S-K, 17 C.F.R. § 229.601(b)(96), govern every disclosure of mineral resources by a registrant whose mining operations are material to its business or financial condition. Ramaco purported to comply with these requirements by filing the Weir TRS as Exhibit 96.1 to its September 18, 2025 Form 8-K, and the TRS itself represented that it "has been prepared in accordance with [S-K 1300]. Unbeknownst to the investing public, that representation was false.[11] The TRS failed to comply with the regulation in several material respects, each traceable to the same defect: Ramaco's fabricated scandium price and demand assumptions.

141. *First*, Item 1303(b)(3)(iv) requires that each mineral resource estimate be "based on a reasonable and justifiable price selected by a qualified person pursuant to § 229.1302(d) or (e)." Item 1302(d)(2) requires the qualified person to "use a price for each commodity that provides a reasonable basis for establishing the prospects of economic extraction" and to "disclose the price used and explain, ***with particularity***, his or her reasons for using the selected price, including the material assumptions underlying the selection."

142. Weir did not select the prices on which the TRS's economic conclusion rested—Ramaco supplied them instead. The TRS's only stated support for the $3,750 per kilogram scandium price consisted of three bullet points in Section 16: unnamed and undated "third-party

---

[11] Weir has been sued in the past for substantially similar conduct. In *Mechel Bluestone, Inc. et al v. Weir International*, Inc., No. 5:13-CV-33881 (S.D.W. Va. 2013), plaintiffs Mechel Bluestone and Mechel Mining ("Mechel"), alleged that Weir misrepresented its independence and included, in its report, amount of coal, that could not be economically mined, and included coal that was not conveyed to Mechel in a Merger Agreement between Mechel and another entity. The Court denied Weir's motion to dismiss pursuant to Rule 12(b)(6). *Mechel*, ECF No. 35 at 12.

independent marketing studies available in the public domain"; "Ramaco's meetings with potential off-takers on western premium pricing projections"; and "Ramaco's meetings with off-takers who provided pricing on recent actual western trades." Thus, the sole support was Ramaco's own say-so regarding studies and meetings never identified or documented.

143. *Second*, commodity prices are not among the six categories of registrant-provided information on which a qualified person is permitted to rely under Item 1302(f)(1), which is limited to macroeconomic trends, marketing information and plans within the registrant's control, and legal, environmental, local-accommodation, and governmental matters outside the qualified person's expertise. By resting its economic conclusions on Ramaco-supplied pricing, the TRS exceeded the regulation's limits on registrant-provided information. Ramaco, which under Item 1302(a)(2) was responsible for ensuring that its disclosure accurately reflected information prepared by a qualified person, knew that the "independent" validation it touted to investors was its own pricing fed back to it.

144. *Third*, Item 1302(d)(1)(i)(B) permits a qualified person to determine the existence of a mineral resource only upon concluding that "there are reasonable prospects for economic extraction" based on an initial assessment. Weir's conclusion of "economic mineability" rested on a single-point, per-tonne unit cost margin comparison (TRS § 19) that excluded from the viability analysis the very capital required to build the project—estimated in the TRS itself at $579 million in initial capital expenditures—and expressly disclaimed any discounted cash flow model, net present value, internal rate of return, or payback analysis.

145. *Fourth*, having elected to include an economic analysis in the TRS, Weir was required by Item 601(b)(96)(iii)(B)(19)(iii) to include "sensitivity analysis results using variants in commodity price, grade, capital and operating costs, or other significant input parameters," and

by Item 601(b)(96)(iii)(B)(19)(ii) to disclose the results of the economic analysis, including annual cash flow forecasts. The TRS contains neither. The omission was no accident. Any sensitivity analysis run at actual scandium transaction prices of $700–1,100 per kilogram—rather than the fabricated $3,750—would have eliminated the TRS's claimed unit margin and, with it, the conclusion of economic mineability.

146. *Fifth*, one hundred percent of the Brook Mine resources reported in the TRS were classified as inferred mineral resources—the lowest-confidence category under Regulation S-K 1300. Item 1302(d)(1)(iii)(B) permits a qualified person to designate inferred mineral resources only where the qualified person has "a reasonable expectation that the majority of inferred mineral resources could be upgraded to indicated or measured mineral resources with continued exploration" and "[s]hould be able to defend the basis of this expectation before his or her peers." Yet the TRS itself conceded that "[t]here is no certainty that any part of the Mineral Resources estimated will be converted into Mineral Reserves in the future."

147. These regulatory violations each served the same end: to cloak Ramaco's fabricated scandium price and demand assumptions in the appearance of independent, regulation-compliant engineering validation, while omitting the very analyses—price sensitivity, capital costs, and cash flow—that would have exposed those assumptions, and the project economics built upon them, as fiction.

148. Jefferies responded the following morning with its most aggressive price target revision yet, raising its target from $27 to $45 per share, a 67% increase, and writing that the upside scenario could reach $90 per share if Ramaco achieved full capacity at the Brook Mine. The mechanics of the upgrade are revealing: Jefferies' $32.70 per share Brook Mine valuation was

derived by averaging its estimate from the original July PEA ($11.02 per share) with its estimate based on the new company-announced scale-up ($54.39 per share).

149. ***Defendants' misstatements pushed the Company's stock price up significantly.*** On October 14, 2025, Ramaco Class A common stock closed at $54.55, representing a *315%* increase in roughly three months from its $13.14 closing price on June 30, 2025, the day before the Class Period.

### G. The Truth Is Reveled Through a Series of Disclosures, Though Defendants Continue to Mislead Investors

150. Beginning on October 23, 2025, the false and misleading nature of Defendants' misstatements was revealed by a series of partial corrective disclosures.

#### ***i. October 23, 2025: the Wolfpack Report***

151. On October 23, 2025, at approximately 1:00 PM EST, investigative market reporter and short seller Wolfpack Research ("Wolfpack") published a scathing 25-page report titled "We Believe METC's Brook Mine Is a Hoax and Management Has Pumped the Stock with a Potemkin Mine and a Fantasy Economic Assessment" (the "Wolfpack Report"). The Wolfpack Report represented a comprehensive challenge to Ramaco's Brook Mine narrative, based on interviews with 15 industry experts, none of whom believed the project was economically feasible.

152. The Wolfpack Report honed in on scandium, to which Ramaco had assigned 59% of the Brook Mine's projected revenue, amounting to $611 million in annual sales under the scaled-up projections Ramaco announced alongside the September 18, 2025 TRS—nearly triple the $222 million in annual scandium revenue projected in the original PEA, reflecting a near-tripling of claimed annual scandium output from 65 tons to approximately 180 tons. The Report pointed out that the entire global market for scandium oxide was approximately $25 million annually, with a single company, Bloom Energy, purchasing 70% of that supply through a separate non-Chinese

source it had already secured years in advance. Excluding Bloom, the remaining global scandium oxide market was worth just $8 million per year. Defendants, however, had represented that Ramaco would sell $611 million of scandium annually, roughly 75 times the available non-Bloom global market. Wolfpack revealed that the EY study that Woloschuk cited on August 1, 2025 earnings call as projecting demand growing to 450 tons per year by 2030 was itself insufficient to validate the economics even if taken at face value, since 450 tons represents less than three times Ramaco's projected 180-ton annual scandium production. The Wolfpack Report thus contradicted the demand creation narrative that Individuals Defendants presented to investors on the August 1 earnings call.

153. According to the Wolfpack Report, the price assumption underpinning this revenue projection was equally problematic. Ramaco had used $3,750 per kilogram for scandium oxide in its PEA inputs, a figure justified by reference to a claimed lack of a reliable western price index. The Report posited that scandium oxide prices had in fact declined 84% since Ramaco began its rare earth exploration in 2019, and that western-friendly scandium oxide was available from competing projects for less than $1,100 per kilogram, with one source indicating that a recent marketing effort for non-Chinese scandium oxide failed to attract buyer interest even at $700 per kilogram. Expert analysis cited in the report estimated Ramaco's scandium price assumption was overstated by approximately 500%.

154. The Wolfpack Report also debunked Ramaco's forecasted gallium sales volume, which was projected to contribute 18% of the Brook Mine's revenue. According to industry experts that Wolfpack interviewed, the entire U.S. market only purchased $8.5 million worth of raw gallium, a far cry from the Ramaco's ambition to sell $188 million per year. As one expert

revealed, "[t]here's already an excess supply of gallium [with] tonnes of gallium available in the world." Wolfpack concluded that Ramaco's gallium sales could be overstated by 22 times.

155. As to the mining activity at Brook Mine, Wolfpack documented, via weekly drone visits to the site beginning in mid-September 2025, that nothing has been done at the site where the Energy Secretary and CEO had ceremonially shoveled coal on July 11. Wolfpack disclosed that the ground remained essentially undisturbed three months later, with orange traffic cones still in place and the ceremonial coal pile still sitting where it had been thrown. The heavy machinery that Defendants brought in, which had appeared on the DOE's YouTube channel and news coverage of the event, was nowhere to be found. Despite multiple site visits during working hours over several weeks, Wolfpack researchers never observed any equipment or active work, and concluded that Defendants' statements about construction of a pilot plant at the Brook Mine added up to "an empty show," disclosing that "[j]ust last Friday [i.e., October 17, 2025], there was nothing going on other than a few stakes in the ground."

156. On this news, Ramaco's Class A common stock price fell $3.81, or 9.6%, from a closing price of $39.82 on October 22, 2025, to a closing price of $36.01 per share on October 23, 2025, on unusually heavy trading volume. The Class B stock price declined as well, from a closing price of $14.87 on October 22, 2025 to a closing price of $14.84 on October 23, 2025, and it continued to fall over the next five trading days.

***ii. October 27 and 28, 2025: Defendant Confirm that Wolfpack Was Correct In Certain Respects, Yet They Continue to Mislead Investors***

157. On October 27, 2025, after market hours, Ramaco issued a press release regarding Q3 2025 results (the "October 27, 2025 Press Release"), which was filed as an attachment to a Form 8-K.

158. In an attempt to rebut the Wolfpack Report, the October 27, 2025 Press Release stated that "we intend to establish ourselves as the nation's leading producer of natural scandium at the Brook Mine," and that "[w]e continue to have very positive dialogue with potential offtake partners in terms of meaningful demand for scandium and expect robust demand that will exceed the Brook Mine's projected annual production." Thus, Defendants again misled investors regarding the viability of their scandium-focused mining strategy and Western demand for scandium.

159. With respect to the status of the pilot plant at the Brook Mine, the October 27, 2025 Press Release confirmed that the Wolfpack Report was correct about the status of the pilot plant. Though Defendants previously stated that the "on-site pilot plant . . . is anticipated to be *fully operational* by mid-2026," the October 27, 2025 Press Release conceded that "[t]he Company has *now* also broken ground on the construction site of the Pilot Plant Oxide ('PPO') facility at its Brook Mine," quoting Defendant Atkins as stating that the "new pilot facility broke ground in Sheridan *last week*."

160. The press release further stated that:

> ***Ramaco has retained Zeton, Inc., a leading pilot plant and fabrication company, to design, factory test and optimize a prototype pilot plant*** at their operation in Oakville, Ontario, Canada. This will be done while construction of the PPO facility is underway in Wyoming, in order to expedite and accelerate future processing operations. Once the PPO facility is constructed in Wyoming, the Zeton prototype

> will be disassembled and shipped to Wyoming for installation at the Brook Mine site.

161. The press release also quoted Defendant Atkins as stating that "[w]hile the building shell for the pilot is being constructed in Sheridan, we will have a prototype pilot plant being built and tested at the operations of Zeton, Inc. in Canada." Thus, Defendants had just recently retained Zeton to design a "prototype pilot plant." Construction of that prototype *had not yet begun*, as indicated by Defendant Atkins' use of the future tense ("we *will* have a prototype pilot plant being built"). Work had begun only on the "shell" of the plant.

162. The press release stated that the pilot plant would not be completed until "mid-2026," after which it would have to "operate to optimize processing and engineering over a subsequent 6-month period prior to the next stage which would be construction of the full commercial oxide plant").

163. Analysts took note of this delay, with a Northland Securities analyst report reducing its price target for the Company's Class A common stock from $50 per share to $44 per share and remarking that "[t]he most noteworthy update was a push to the right of pilot plant start-up from beginning operations by year-end 2025 to operational by mid-2026."

164. On October 28, 2025, before market hours, Defendants held an earnings call with analysts regarding the Company's Q3 results. During the call, as with the October 27, 2025 Press Release, Defendants made additional material misstatements while also confirming that Wolfpack was correct in several respects.

165. During the call, Defendant Atkins stated that "[w]e broke ground on the pilot [plant] last week and expect to begin initial operations in 2026." Blanchard stated that:

> At our pilot plant location, the geotechnical drilling commenced and was completed during the month of September and the subsequent engineering report to allow our foundation design was completed just in the last weeks. . . . and we expect to get the actual foundation work begun in November. We expect to have the building

under roof early in 2026 to receive delivery of the first pilot plant modules from Zeton.

166. Thus, while Blanchard asserted that "geotechnical drilling" was complete, he conceded that the "engineering report to allow [the] foundation design" for the pilot plant was only recently complete, and "the *actual* foundation work" had not even begun.

167. Analysts pressed for more details, with one asking:

> My second question was, you announced the pilot plant oxide facility the other day and the – or the groundbreaking at least, and the target is to be operational by mid-2026, and then you expect to operate it for a six-month period. I believe that's fairly accelerated relative to other pilot facilities across the space. So my question is what ultimately gives you the confidence that you'll be able to fine tune and validate the processing techniques on this timeline?

168. In response, Defendant Atkins attempted to cover the tracks of his previous misrepresentations by stating that "what we're trying to do is kind of fast track it." Woloschuk added that "we've been designing the pilot plant now for a couple of months." Thus, when Defendants were touting the imminent construction of the pilot plant, they were in fact still working with unfinished designs. Atkins jumped in again to claim that "I'd just like to add, I think we are doing a lot of stuff behind the scenes that we're not exactly announcing on a daily basis," and that "the amount of behind the scenes work is a lot more substantial than I think might meet the eye."

169. Defendants' statements thus confirmed that Wolfpack was correct regarding the status of mining and construction activity, while still misleading investors regarding the timeline for the next steps for the mine. As was later revealed, because Defendants' scandium-centric strategy was not feasible, the pilot plant would have to be redesigned, delaying the entire commercialization process by over a year.

170. As to scandium, Defendant Atkins repeated prior misrepresentations, stating that

> But to focus on scandium for a moment, although Mike will also discuss in more detail later, it is of particular interest given our large future production level. It is called the forgotten rare earth. The US is a 100% import reliant on scandium. We have no stockpile, no recycling capability nor current production capacity. It is used in lightweighting autos and planes, solid oxide fuel cells, semiconductors, 6G wireless for drones, satellite communications and other defense capabilities. Global production is very scarce, with a small global market of frankly under 50 million tons per annum. We will produce almost 180 million tons per annum. And it's estimated that ***scandium alloys in the auto sector alone would require over 1,000 tons per annum, which is frankly not currently available***.

171. Atkins then doubled down, stating that "*from recent discussions with potential scandium oxide offtakers, we expect almost* **price insensitive demand** *to exceed the Brook Mine's projected annual production*," and that "[i]ts demand growth is exceptionally strong."

172. Analysts again pressed for details, with one asking

> And then just given some of the substantial value that is coming from the facility or coming from the site through scandium. Can you talk about how mature those conversations are? Any sort of issues around pricing, either higher or lower, that you see potentially impacting some of these estimates, as some of the incremental capacity comes online? I think some folks may get a little concerned that you start impacting some of the broader market prices, but that may not be the case. Just want to get a sense of how substantial those conversations are and some of the impacts around some of the [sic]

173. In response, Atkins stated that "

> We're not going to get too far under the weeds in terms of discussions about negotiations that are taking place in real time. I will say that ***we are having discussions with both domestic and international customers as it relates to scandium***. ***We've not gotten to price specifics at this point***, but as I've mentioned, the last, frankly, major price marker was the one that the US government established with their deal with Rio here a couple of weeks ago. And in terms of negotiations, we obviously don't negotiate in public like anyone else does. And once we get to a point where we have actually agreement on any points, then obviously that'll be disclosed.

174. Thus, Defendant Atkins conceded that the Company's discussions with customers had not even addressed pricing, undercutting Defendants' prior assurances about the basis of their scandium price and demand assumptions. However, Atkins falsely and misleading represented that "recent discussions with potential scandium oxide offtakers" supported Defendants' scandium

strategy, as there would be "almost price insensitive demand" for scandium. The fact that Defendants abandoned their scandium-heavy strategy, despite this supposed price sensitivity, confirms that Defendants' statements were materially false and misleading.

175. In response to Defendants' disclosures revealing the false and misleading nature of their prior misstatements, the price of the Company's Class A common stock fell 16.9%, from $33.97 per share at the close of trading on October 27, 2025, to a closing price of $28.22 per share on October 28, 2025. Ramaco's Class B common stock fell 8.8%, from a closing price of $14 per share on October 27, 2025, to a closing price of $12.77 per share on October 28, 2025.

***iii. Expert Interviews During October and November 2025***

176. Between October 27 through October 30, 2025, interviews with several industry experts were published by AlphaSense, a market research platform, between November 10 and 14, 2025. As the information revealed by these interviews leaked into the market, Ramaco's stock prices declined significantly.

177. These experts uniformly agreed that the TRS was well below prefeasibility and lacking in accuracy to make informed investment decision about Brook Mine. They also agreed that the reported ore grade, i.e., 500 ppm concentration was on the low end, characterizing the grade as "medium at best," "marginal," and below historical minimum of 1,000 ppms seen in other viable projects. They also all agreed that Ramaco's 5-million-ton production projection in 2028 was unrealistic and that Ramaco could achieve not even half of that.

178. Regarding scandium, Brook Mine's core revenue driver, one of the interviewed experts, Expert #1, a former executive at Hatch, the engineering company that Ramaco has hired to prepare a Pre-Feasibility Study for the Brook Mine REE project, criticized Ramaco's projected 65 tons per year scandium output as it represented double the size of the entire global market for

scandium, which is only 30-40 ton per year. He argued that unless there's a breakthrough in scandium-aluminum alloy adoption by aerospace and automotive, which you "can't count on," the scandium thesis "just doesn't appear realistic…" Another expert, Expert #2, a professional mining engineer with over 45 years' experience, confirmed that demand growth for scandium will be slow and likely in the range of 7–8% per year, meaning that it will take 8 to 10 years to double from current levels — nowhere near fast enough to absorb a 3–4x supply increase that Ramaco envisioned.

179. As to gallium, he called the $770/kg assumption too high, suggesting $400 is more defensible. The overall conclusion was that the price assumptions are not grounded in any established market, they hinge on outcomes that haven't materialized yet, making the entire NPV calculation "a flag," and "just too much of a flyer." Regarding the $5 billion valuation, Expert #1 argued that at realistic scandium levels (far below 65 tons per year) and attainable prices (rather than unsubstantiated Western premiums) and reasonable operational costs, the NPV story Ramaco presented collapses materially.

180. The industry experts revealed additional risks not surfaced by Wolfpack. Expert #4, the President at Arkenstone Exploration rebutted Ramaco's claim that Brook Mine scandium deposit was uniquely valuable. He identified the Elk Creek carbonatite in southern Nebraska as containing deposits of scandium that were "much higher grades," and which were detected through USGS aeromagnetic surveys and were already drilled and confirmed.

181. The publication of the expert interviews during November 10 through November 14, 2025, caused Ramaco's Class A common stock price to decline $3.87, ***or 15.2%***, from a $25.46 opening price on November 10, 2025, to a closing price of $21.59 on November 14, 2025. By early December 2025, Ramaco's Class A common stock price had fallen to below $15 per share, less

than a third of its $54.55 closing price on October 14, 2025, which was its highest closing price *ever*. The Company's Class B common stock also declined during that period, from an opening price of $15.45 on November 10, 2025, to a closing price of $15.25 on November 14, 2025, and a closing price of $11.41 on December 2, 2025.

182. On November 16, 2025, *Cowboy State Daily*, a Wyoming news source, published an article regarding the Wolfpack Report and Defendants' responses thereto, entitled "Ramaco's Rare Earth Claims Draw Fierce Scrutiny From Geologists, Short-Sellers." The article noted that Atkins sent Cowboy State Daily an email with "several reports and documents, some detailing what he characterized as really good news about one critical mineral in particular: scandium." The article also stated that "Atkins said Cowboy State Daily had been duped by investors at Wolfpack Research and, 'drawn into this to play a role on their behalf attacking a Wyoming project.'"

183. However, the article described interviews with experts, reporting that "[t]hree mining professionals with more than a century of combined industry experience reached out to *Cowboy State Daily* starting back in July, and in a series of interviews shared their findings about the company."

184. One, Keith Laskowski, which the article described as a "Montana-based mining consultant with more than 40 years of experience," reportedly stated that the Wolfpack Report "validates many of the concerns I have observed during the course of the last two years in watching the Ramaco program evolve." Laskowski further stated "This is textbook. This is a repeat of the biggest scam in the gold mining business that occurred in 1997," a reference to a fraud by Bre-X Minerals Ltd., which claimed to have discovered massive gold deposits at a mine in Indonesia, sending its stock price soaring before an independent analysis revealed that the core samples

examined by Bre-X's consultants had been "salted" with gold dust. Bre-X filed for bankruptcy soon thereafter.

185. Another expert, David Hammond, a Colorado mineral economist, told Cowboy Stte Daily that the Brook Mine project is "so over the top as far as its level of misleading us, and just really bogus numbers in there that no one should put any credibility on it."

186. A third expert, Marc LeVier, a mineral process engineer with over 40 years of experience, including 22 years at Newmont Mining Corp., the largest gold mining company in the world, reportedly "characterized Ramaco's approach as deceptive." Levier told Cowboy State Daily that "[t]he whole problem is they're not following a true project development scenario in terms of what you would go through to develop a real mine," referring to Ramaco's commissioning of technical reports, studies and process testing before announcing plans for a pilot plant.

187. According to *Cowboy State Daily*, "[t]heir concerns boil down to whether or not the world really wants as much scandium as Ramaco claims it will produce."

188. The *Cowboy State Daily* article further revealed that Defendants' statements regarding the prospects and value of the Brook Mine, including the scandium price that Defendants used to justify their statements, were seen as unreasonable by industry experts and were materially false and misleading

189. Following the publication of the *Cowboy State Daily* article, Ramaco's stock prices declined. The Company's Class A common stock fell 3.9% from its closing price of $21.59 on November 14, 2025 (the prior trading day), to close at $20.75 on November 17, 2025 (the next trading) day, and continued falling over the four subsequent trading days, closing at $16.15 on November 21, 2025. The Company's Class B common stock fell 0.2% from its closing price of

$15.25 on November 14, 2025, closing at $14.48 on November 17, 2025, and continued falling over the four subsequent trading days, closing at $11.65 on November 21, 2025.

***iv. February 25 and 26, 2026***

190. On February 25, 2026, after market hours, Ramaco issued a press release announcing that it had "developed a fundamental alternative flowsheet design for the processing of its rare earth elements and critical minerals from coal deposits. This process is both proprietary and patent-pending and has been developed by Ramaco's new internal critical mineral processing team." The press release stated that this new "design improves upon the solvent extraction processing techniques previously modeled and outlined in the Preliminary Economic Assessment ('PEA') prepared in mid-2025 by Fluor Corporation."

191. The new flowsheet design employed a "carbochlorination" method to process REEs and CMs at the Brook Mine, abandoning the solvent extraction technique that had been the basis of the entire Fluor PEA. The press release stated that this would

> provide ***fundamental de-risking of the previous processing approach*** by reducing the overall capital and operating costs associated with oxide production, improving overall recoveries and product yields, increasing cash flow, creating a higher value product slate, while using a proven technique deployed in the titanium industry and ***reducing the project's reliance on scandium as the main product driver***.

192. The press release stated that "[t]his change is expected to greatly simplify and eliminate the need to construct the costly portion of the processing facility associated with the technically complex solvent extraction form of separation of the rare earths into separated magnetic oxides" and thus "eliminate the substantial capital and operating cost associated with construction and development of the previous large solvent extraction portion of the overall plant." Thus, instead of producing separated rare earth products, the Company now planned to produce a "mixed rare earth carbonate" (or "MREC").

193. Thus, Defendants acknowledged that the scandium-centric strategy they touted as establishing the economic feasibility and profitability of the entire project actually posed a "fundamental" risk.

194. The new flowsheet design fundamentally changed the Company's plan for Brook Mine and effectively rendered the Fluor PEA, and every headline metric derived from it (such as the previously-touted $1.2 billion NPV, 38% IRR, and $143M EBITDA), obsolete. The Company thus required a *new* PEA to replace the Fluor PEA. The press release "[w]e now expect to receive a revised PEA being prepared by Hatch, Inc. by mid-year. This PEA will generate revised economics utilizing the new flowsheet."

195. The Company's pivot substantially delayed its prior timeline. Defendants disclosed that the PFS, previously anticipated "early" 2026, and then in mid-2026, was now not expected until *late* 2026. Further, the press release stated that

> As part of this new flowsheet analysis ***Hatch is expected to provide a pilot plant re-design expected by Q3-2026***. During this redesign period we will continue current construction of the pilot plant and testing facility in Sheridan, WY. Development of the interior pilot plant infrastructure is expected to recommence at the Zeton pilot plant fabrication facility in Canada upon receipt of Hatch plans.

196. Previously, Defendants had told investors that the pilot plant for the Brook Mine would be "operational" by mid-2026 and "will be expanded to a full commercial scale facility late in 2026." On August 1, 2025, Defendant Woloschuk stated that "we plan to rapidly construct our pilot facility so that we can begin pilot operations this fall" and described "the acceleration of the pilot plant as the crucial next step on the path to commercialization." Thus, this was a major delay.

197. Following this news, Jefferies *halved* the Brook Mine value in its model from $10 per share to $5 per share, and Northland Securities raised its discount rate for the Brook Mine project from 12% to 15%, thus lowering its valuation. Morgan Stanley explicitly noted they could no longer model the rare earth segment and placed their price target for Ramaco under review. A

Northland Securities analyst report reduced the price target for Ramaco's Class A common stock from $44 to $30—a *31.8%* decrease—noting that the announced changes, which "increase[d] economic weighting from scandium to gallium," "make sense but lacked details and pushed back timing on the PFS and pilot plant." The report noted that "[t]he Company now plans to produce a mixed rare earth carbonate, rather than producing separated rare earth products, which will reduce CapEx/OpEx *as separating rare earths is one of the costliest steps*."

198. The next day, on February 26, 2026, before market hours, the Company held an earnings call regarding its results for 2052. In his opening remarks, Defendant Atkins stated that this new carbochlorination technique "***reduces the project's reliance on scandium as the main product driver***, although we still feel scandium is an important future use for our rare earths. We are now working with our independent consultant, Hatch, to validate these estimates and expect to publish a revised PEA with third-party economics by the middle of the year." Atkins reiterated that the new approach would "reduce the overall percentage of scandium production," and further stated that:

> We now anticipate that the largest percentage of production will come from the combination of high-purity gallium, high-purity alumina, as well as high-purity quartz. These all target the semiconductor industries and are very high-value products. As mentioned, *we also anticipate that this approach will reduce the overall percentage of scandium production.* ***We continue to think that scandium use will prove to be a very important developing market***. *However, the current appetite for high-purity gallium and its related alumina and quartz in the semiconductor industry is both proven and rapidly expanding*. We hope the Brook Mine will be an important and meaningful resource for this critical industry.

199. Jason Fannin, Ramaco's Chief Commercial Officer, hammered the same message, stating that the new flowsheet design "should enhance product quality, lower capital intensity, and sharpen our commercial focus toward high-purity gallium and strategic MREC partnerships," rather than toward scandium. Fannin also stated that "[t]hese flowsheet enhancements, combined with our elevated gallium focus, materially expand our addressable market. We are in active

dialogue with several companies and a wide variety of potential customers regarding potential offtake and partnership structures." Fannin made no mention of discussions with potential customers regarding scandium.

200. The first analyst question addressed these changes, which the analyst described as "abrupt," and sought detail regarding Defendants' discussions with the government and potential customers for offtake agreements. In his response, Defendant Atkins stated that:

> we think scandium is going to be a very important part of the whole kaleidoscope of different types of rare earth usage moving forward. It's mainly going to be used for lightweighting and obviously for some electronic storage. ***But it's a market that is a bit more in the future that's evolving***.
>
> The gallium market for semiconductors is not only apparent today, but it's growing rapidly given sort of the electrification of the entire economy and, of course, the AI business. ***So, we are finding a high level of receptivity, both with strategics as well as with the government, in terms of a pivot toward more gallium and perhaps a lesser emphasis on scandium***.

201. Further, though Defendants repeatedly characterized the delay resulting from their abandonment of a scandium-focused strategy as "modest," they conceded, in response to an analyst noting that it "[s]eems like it's about a year delayed," that "we're projecting a few quarters of delay because of this change."

202. Defendants' disclosures thus revealed that their prior focus on scandium was not feasible and based on a groundless assumptions about pricing and demand, that the resulting economics of the project were baseless, and that their prior statements about pilot plant construction—and the resulting timeline for commercialization of the mine—were false and misleading.

203. On this news, Ramaco's Class A common stock price fell $3.64, or 15.5%, from a closing price of $17.66 on February 25, 2026, to close at $14.93 on February 26, 2026. The Class

B stock fell 1.5%, from a closing price of $12.70 on February 25, 2026, to close at $12.51 on February 26, 2026.

**H. Post-Class Period Events**

204. On May 11, 2026, Ramaco reiterated that the new PEA it had commissioned from Hatch was anticipated in late June. As of the filing of this Complaint, Defendants have not announced receipt of that new PEA.

205. In addition, also on May 11, 2026, Ramaco told investors that "[t]he pilot plant's building structure is *now* being constructed in Wyoming with anticipated completion this summer." Thus, despite their attempts to rebut the Wolfpack Report by stating, on October 27, 2025, that "the building shell for the pilot is being constructed in Sheridan" while the actual workings were constructed by Zeton off-site in Canada, and their assurances on February 25, 2026 that the Company was continuing "current construction of the pilot plant and testing facility in Sheridan, WY" while "[d]evelopment of the interior pilot plant infrastructure" by Zeton would "recommence upon receipt" of redesigned plans from Hatch, the Company was just "*now*," as of May 11, 2026, constructing the structure of the pilot plant. This disclosure further confirmed that Defendants misled investors during the Class Period regarding the status of construction of the pilot plant and activity at the Brook Mine.

206. As Defendants have abandoned the mine development plan touted during the Class Period and purportedly validated by the Fluor PEA and Weir's September 2025 TRS, and with no new PEA, no pilot plant, and a PFS still months away (even according to Defendants' timeline), investors are in the dark as to fundamental details regarding the Brook Mine.

## V. CLASS ACTION ALLEGATIONS

207. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased

or otherwise acquired shares of the Class A common stock and/or Class B common stock of Ramaco, or call options, or sellers of put options, between July 1, 2025 and February 26, 2026, both dates inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

208. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Ramaco's shares actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of Ramaco shares were traded publicly during the Class Period on the NASDAQ.

209. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

210. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

211. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Defendants' acts violated the federal securities laws as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Ramaco;
- whether Defendants acted knowingly or recklessly in issuing materially false and/or misleading statements;
- whether the Individual Defendants were controlling persons under Section 20(a) of the Exchange Act; and
- to what extent the members of the Class have sustained damages and the proper measure of damages.

212. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.

213. There will be no difficulty in the management of this action as a class action. Class members may be identified from records maintained by the Company or its transfer agent(s), or by other means, and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

## VI. LOSS CAUSATION

214. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

215. During the Class Period, Plaintiffs and the Class purchased Ramaco's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities

significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses, as set forth in section IV.G., *supra*.

## VII. ADDITIONAL SCIENTER ALLEGATIONS

216. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

217. A strong inference that the Individual Defendants, and thus the Company, acted with scienter when making material misstatements is established by the allegations above as well as those set forth below in this section VII.

### A. Defendants' Detailed Statements about The Brook Mine and Their Admissions of Direct Involvement in the Project Contribute to Scienter

218. Each of the Individual Defendants spoke about the Brook Mine REE project, including the price assumptions and market for scandium, the status of the pilot plant, the Fluor PEA, and the September 2025 TRS, repeatedly and at length throughout the Class Period. During every single earnings call during the period, Defendants discussed these matters in detail, often in response to direct analyst questions. Further, Defendants issued extensive statements regarding these matters in press releases and SEC filings, such as the 15-page July 1, 2025 Atkins Letter and the 8-page September 18, 2025 Atkins Letter, both from Defendant Atkins.

219. In addition, the Individual Defendants repeatedly represented that they were closely involved in the Brook Mine REE project. As one example, the July 10, 2025 PEA Summary stated

that "[a] financial model . . . developed to support Ramaco's evaluation of the Brook Mine Rare Earth project's potential viability . . . was created collaboratively by Fluor and Ramaco and endorsed by the company's Chief Financial Officer (CFO)," i.e., Defendant Sussman. For another example, Defendant Atkins noted on August 1, 2025 that both he and Defendant Woloschuk were present for three days of all-hands meetings between Ramaco's rare earth term and the Department of Energy.

### B. Woloschuk Was Directly Involved in the PEA while at Fluor

220. The scienter of Defendant Woloschuk is further established by the fact that he was directly involved in preparing the Fluor PEA during his tenure as the Global Head of Critical Minerals at Fluor prior to joining Ramaco. Woloschuk told investors that he "personally" worked on Ramaco's Brook Mine project beginning in the fourth quarter of 2024, while he was still at Fluor. Further, as Defendant Atkins noted on October 28, 2025, the price estimates in the September 2025 TRS, which were "the same price deck that was used in the summary of Fluor's [PEA] in July. . . . were prepared and reviewed by the same person who is Mike Woloschuk." These facts contribute to a strong inference of Defendant Woloschuk's scienter.

### C. Defendants Raised Hundreds of Millions of Dollars from Investors While the Company's Stock Prices were Artificially Inflated

221. During the Class Period, Defendants raised hundreds of millions of dollars while the Company's stock prices were artificially inflated by their misstatements concerning the Brook Mine. Defendants were able to raise more money due to the effect of those misstatements on the stock price and investor confidence in the Company's prospects. In addition to the Notes Offering, which raised gross proceeds of $57 million, and the August 2025 SPO, which raised gross proceeds of approximately $200 million, the Company also raised $345 million from investors in an offering of0% convertible senior notes due 2031, which took place on or around November 4, 2025. That

Defendants took advantage of the Company's artificially inflated stock price to raise over $600 million from investors before the truth was fully revealed strongly contributes to an inference of their scienter.

**D. Insider Sales**

222. During the approximately eight-month Class Period, while Ramaco's stock prices were artificially inflated, insiders like Peter A. Leidel and Bryan H. Lawrence, directors at Ramaco and founders of Yorktown Partners LLC[12], Ramaco's largest shareholder, reaped huge gains from insider sales. Soon after July 2025 hype of the Brook Mine—and less than a month after the Fluor PEA was presented to the Board—Leidel and Lawrence sold 1,600,000 shares *each*, translating to almost 30% of their respective holdings at the artificially-inflated price of $18.75 per share. Via these insider sales, Leiden and Lawrence raked in $30 million in sales proceeds. These sales were timed to take advantage of the artificial inflation caused by Defendants' misstatements. Indeed, prior to July 2025, Ramaco's stock lagged around the $10 mark, or approximately half of the price garnered by these insiders. Further, Leiden and Lawrence's Class Period sales far exceeded their sales (or, indeed, any insider sales) made during the months preceding the Class Period or since the Class Period. These sales, made by insiders with a long-standing connection to Defendant Atkins dating to the founding of Ramaco, when Yorktown became a major shareholder, further support a finding of scienter.

[12] Indeed, Yorktown Partners was sued for allegedly bribing an energy company's lead negotiator with cash, equity and a cushy job during Yorktown's and Rhino Resource Partners LP's merger talks. The lawsuit named various executives of Yorktown, including Lawrence.

**E. Defendants' Prior Misconduct**

223. Ramaco is also not new to creating unfounded hype around its untested experiments. In 2017, when Defendant Atkins was Executive Chairman, Ramaco touted a "coal to cars" or "coal to carbon fiber" initiative, claiming that it could convert coal into carbon fiber for use in cars. Touting the Powder River Basin (the region Brook Mine resides in), Ramaco claimed that the area is uniquely suited for coal to carbon conversion.

224. In 2023, however, a Department of Energy lab revealed that conversion of coal to carbon was largely a failure, finding that the Powder River Basin was not suitable for producing carbon fiber. Despite this finding, Defendant Atkins, in Ramaco's Q1 2023 earnings call, told analysts that the carbon fiber initiative would "probably" have "meaningful commercial possibilities" within the next year. This has not panned out. Indeed, the Company's annual reports for 2022, 2023, and 2024 each mentioned "fiber" only once, stating that "Ramaco Coal . . . has a goal of converting coal to carbon products, such as graphene, graphite, and carbon fiber." The word "fiber" does not even appear in the Company's annual report for 2025.

225. In addition, Defendant Atkins has a documented history of misconduct that enriched him at the expense of investors. As general partner of The Securities Group, a bankruptcy court found him civilly liable for $32 million in damages and guilty of breach of fiduciary duty, conversion, misappropriation of partnership assets, and violations of the federal RICO statute. Defendant Atkins' brother and Ramaco colleague, Charles Atkins — Director of Research & Development — was indicted on 31 counts for creating approximately $1.1 billion in fraudulent trading losses during his tenure at The Securities Group, convicted of conspiracy to defraud the IRS and aiding and abetting the filing of false tax returns, and sentenced to two years' imprisonment.

226. Defendant Atkins appealed the bankruptcy court's rulings to a district court and then to the Eleventh Circuit. However, the circuit affirmed the bankruptcy court's findings, holding that "Atkins actively participated in the purchase of the property and facilitated the transfer" that misappropriated the plaintiffs' property, that "Atkins clearly was aware of the nature of the transactions," and that "Atkins enjoyed a personal windfall from the transactions." *In re Monetary Grp.*, 2 F.3d 1098, 1104 (11th Cir. 1993). Thus, the Eleventh Circuit found that "Atkins' conduct directly violated his fiduciary duty as a partner of TSG and TMG to refrain from personally profiting from the misuse of partnership assets." *Id.*

**F. The SEC Sent Defendants a Comment Letter Regarding Their Statements Concerning the Brook Mine**

227. The inference that Defendants acted with scienter is strengthened by the fact that on August 19, 2025, the SEC sent Ramaco a comment letter regarding its disclosures concerning the Brook Mine. Defendants have not released this letter publicly, but they have disclosed that the comment letter

> principally concerned: (i) ***our disclosures and public statements regarding the Preliminary Economic Assessment ("PEA")*** for the Brook Mine rare earth elements and critical minerals project, ***including the basis for statements characterizing the project as technically and economically viable*** in light of the AACE Class 5 classification and the conceptual nature of the underlying exploration target; (ii) ***the consistency of our disclosures regarding the preparation of the PEA under Regulation S-K Subpart 1300 with our release of a Company-prepared summary and references to the AACE classification system***; and (iii) whether our plans to commence carbon ore mining activities and to construct a pilot-scale concentrate processing facility could result in a material change to our operating results or financial condition in future periods, and our related considerations under Item 303 of Regulation S-K.

228. Defendants' receipt of this letter questioning the propriety of their disclosures concerning the Fluor PEA and the Brook Mine, including their statements "characterizing the project as technically and economically viable," constituted a red flag alerting Defendants to the false and misleading nature of their statements. This provides strong evidence that Defendants'

subsequent misstatements regarding the Brook Mine were made with scienter, such as the statement in the September 4, 2025 Press Release that "Fluor's preliminary economic assessment (PEA) confirm[ed] the project is both commercially and technologically feasible."[13]

## VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

229. The market for Ramaco's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Ramaco's securities traded at artificially inflated prices during the Class Period.

230. During the Class Period, the artificial inflation of Ramaco's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.

231. At all relevant times, the market for Ramaco's securities was an efficient market for the following reasons, among others:

- Ramaco shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;
- As a regulated issuer, Ramaco filed periodic public reports with the SEC and/or the NASDAQ;
- Ramaco regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases

[13] Following the Class Period, on March 25, 2026, Defendants received another comment letter from the SEC regarding their statements concerning the Brook Mine. Defendants have not released this letter either, but they did disclose that the letter concerned Defendants' "disclosures concerning the Brook Mine Rare Earth Project" in Ramaco's annual report on Form 10-K for the year ending December 31, 2025, as well as the Weir TRS, "including the conformity of those disclosures with Subpart 1300 of Regulation S-K, the content requirements of Items 1302(d) and 601(b)(96) of Regulation S-K applicable to the [Weir TRS]."

on the national circuits of major newswire services and through other wide-ranging public disclosures; and

- Ramaco was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.

232. As a result of the foregoing, the market for Ramaco's securities promptly digested current information regarding Ramaco from all publicly available sources and reflected such information in Ramaco's share price. Under these circumstances, all purchasers of Ramaco's securities during the Class Period suffered similar injury through their purchase of Ramaco's securities at artificially inflated prices and a presumption of reliance applies.

233. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.

## IX. NO SAFE HARBOR

234. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false and/or misleading statements pleaded in this Complaint. The statements alleged to be false and/or misleading herein all relate to then-existing facts and conditions. No cautionary language could, or did, protect Defendants' material misstatements of present and historical fact.

235. To the extent any of the false or misleading statements alleged herein can be construed as forward-looking, (a) they were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements, and the generalized risk disclosures the Company or Individual Defendants made were

not sufficient to shield Defendants from liability, and (b) the person who made each such statement knew that the statement was untrue or misleading when made, or each such statement was approved by an executive officer of the Company who knew that the statement was untrue or misleading when made.

## X. COUNTS

### FIRST CLAIM

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

236. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

237. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Ramaco's securities at artificially inflated prices.

238. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Ramaco's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

239. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Ramaco's financial well-being and prospects, as specified herein.

240. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Ramaco's value and performance and continued substantial growth.

241. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

242. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

243. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Ramaco's securities was artificially inflated during the Class Period.

244. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Ramaco was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Ramaco securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

245. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

246. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act Against the Individual Defendants

247. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

248. Individual Defendants acted as controlling persons of Ramaco within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the

Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.

249. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

250. As set forth above, Ramaco and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

- Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;
- Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment and post-judgment interest thereon;
- Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and
- Awarding such other and further relief as the Court may deem just and proper.

## XII. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: June 22, 2026

Respectfully submitted,

/s/ Jonathan D. Park

**POMERANTZ LLP**
Jeremy A. Lieberman
Jonathan D. Park
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
jpark@pomlaw.com

**LOWEY DANNENBERG, P.C.**
Andrea Farah
Radhika Gupta
44 South Broadway, Suite 1100
White Plains, New York 10601
Telephone: 914-997-0500
Email: afarah@lowey.com
rgupta@lowey.com

*Co-Lead Counsel for Co-Lead Plaintiffs Andrew Clark, Phil McBride, and Edward Van Vliet, and Co-Lead Counsel for the Class*

**PORTNOY LAW FIRM**
Lesley F. Portnoy, Esq.
28310 Roadside Drive, Suite 244
Agoura Hills, California 91301
Telephone: (310) 692-8883
lesley@portnoylaw.com

*Additional Counsel for Phil McBride*